## Case No. 3,802.

### DENNISTON et al. v. IMBRIE.

[3 Wash. C. C. 396.] [1]

Circuit Court, D. Pennsylvania. April Term, 1818.

PAYMENT BY BILL OF EXCHANGE — FAILURE TO PRESENT — INTEREST — USAGE—DEBT TO ALIEN ENEMY—AGENCY DURING WAR.

1. If a debtor remit a bill to his creditor, in payment of the debt, and he receives it as such, and credits the debtor, it is a payment; and he can only sue the debtor as endorser; and if he neglect to present it in time for acceptance and payment, and to give notice of its dishonour, he makes the debt his own; whether the drawer had funds in the hands of the drawee or not.

[Cited in Ward v. Smith, 7 Wall. (74 U. S.) 453.]

2. A usage to add interest at the end of the year, to the annual account, and interest on the balance, does not apply in a case in which the commercial intercourse between the two countries in which the parties reside, had ceased, when the account was transmitted; nor will it authorize the creditor to make other rests in the account.

[Cited in Bainbridge v. Wilcocks, Case No. 755.]

3. If an alien enemy has an agent here, and this is known to the debtor, interest ought not to abate during the war.

[Explained in New York Life Ins. Co. v. Davis, 95 U. S. 432.]

Action by the plaintiffs, merchants of Glasgow, for goods shipped to the defendant, a merchant of Philadelphia. The defendant claimed, amongst others, the following credits:

1. The amount of a bill of exchange for £300 sterling, drawn by Eves & Wistar in favour of the defendant, on Barber & Co. of Liverpool, at sixty days, payable in London. This bill, which bore date the 2d of October, 1806, was enclosed by the defendant to the plaintiffs, with directions to place the same to his credit. On the 6th of November it was noted for non-acceptance, and for non-payment on the 30th of January, 1807. The protest for non-payment, states, that the drawees were asked, whether, if the bill had been presented for payment when at maturity, they would have paid it; and was answered, that they would not, for want of funds of the drawers; but that it was probable, Mr. Guest would have provided for it. This bill was credited by the plaintiffs to the defendant, in their account, on the 6th of

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States. under the supervision of Richard Peters, Jr., Esq.]

November, 1806, and was charged to him on the 24th of February, 1807. It was returned to the defendant, in a letter from the plaintiffs, dated the 31st of January, 1807, (which was the first notice the defendant had of its dishonour,) in which they admit, that it had been overlooked, and had not been presented for payment at the proper time; but that the validity of their claim against the drawers, was not impaired, as payment could not then, or at any subsequent period, have been obtained. On the 14th of March, 1807, the defendant wrote to the plaintiffs, that not having heard any thing respecting the bill, he presumed it had been paid. In a subsequent letter, in answer to the plaintiffs' of the 31st of January, he regretted that the tottering circumstances of the drawers of the bill, rendered it doubtful if they would be able to take it up; but promised to do what he could to secure it; stating, at the same time, that in consequence of their negligence, he should consider the loss as the plaintiffs', should a loss happen. By a letter from the drawees to the drawers, inclosed in another from the plaintiffs to the defendant, and referred to by the plaintiffs, it appeared, that if this bill had been presented for payment in time, it was probable it would have been provided for. The reading of this letter was objected to by the plaintiffs' counsel, and allowed by the court to be read, as part of the correspondence; but without deciding how far it was to be considered as evidence of the facts it contained. This letter spoke of Mr. Guest, in relation to the payment of this bill; and the plaintiffs offered to read a letter from Mr. Guest, explanatory of it, which was overruled by the court. Evidence was given, both by the plaintiffs and the defendant, as to the circumstances of the drawers of this bill, from December, 1806, to April, 1807, when they stopped payment; to show, on the one side, that if the bill had been duly protested, and notice given, payment might have been secured; and on the other, that it could not.

2. The next credit claimed, was for an abatement of interest during the late war. It was proved, that one of the plaintiffs was in New-York during a part of the war, from some time in 1813, of which the defendant had notice.

3. The plaintiffs had been in the habit of forwarding their accounts annually to the defendant, from 1806 to 1809; in which the balance of interest was credited, or debited, as the case might be, and added to the balance of principal, on which aggregate, interest was regularly charged. From 1809, the mercantile transaction between these parties ceased. Some time in the year 1814, the agent of the plaintiffs called on the defendant with his account, stating the principal and interest to that time; and the demand being resisted, or not complied with, this suit was brought. The defendant objected to paying interest on interest, after

the commercial transaction between these parties ceased, in 1809. Evidence was given to prove, that the uniform usage of this trade was, for the merchant in Great Britain, to send forward annually his account current to his correspondent here, and to add the balance of interest to the principal, and this aggregate to carry interest.

Mr. Levy, upon the first point, contended, that want of effects in the hands of the drawees, or other circumstances, showing that no injury was sustained by an omission to protest in time, and to give due notice, would not invalidate the claim of the holder. Chit. Bills, 68, 86.

2. Upon this head, he relied upon the treaty of 1794, between Great Britain and the United States (article 10), and upon the unreasonableness of abating interest during the war. But in this case, the plaintiffs were in the United States, of which the defendant had notice.

3. On the third point, he relied on the usage, as proved, and cited 1 Vern. 194; 1 Swift's Laws Conn. 388, 389.

Chauncey & Binney, for defendant, on the first point, cited Chit. 224, 158, 162; Lovelace, 80, 81; 16 East, 247; 3 Johns. Cas. 5; 12 Mass. 89; 10 Mass. 52; [French's Ex'x v. Bank of Columbia] 4 Cranch [8 U. S.] 141; 2 Caines, 344; 11 East, 113; Chit. 130; 3 Bos. & P. 241.

2. They objected to the account, only so far as interest was compounded, after 1809, when all transactions between the parties ceased, and the annual accounts current were not sent in.

3. They relied on the decision of this court in the case of Conn v. Penn [Case No. 3,105], during this term.

WASHINGTON, Circuit Justice (charging jury). The first point to which we shall draw your attention is, the credit claimed by the defendant on account of the bill of exchange, drawn by Eves & Wistar on Barber & Co. in favour of the defendant, and by him remitted to the plaintiffs, on the 8th of October, 1806; which the plaintiffs were desired to place to the credit of his account. This bill was received early in November of the same year, and was credited on the 6th of that month. It was noted for non-acceptance on the same day; and, of course, was at maturity on the 6th and 9th of January, 1807. It was, however, not presented for payment till the 30th of that month; and was then noted for non-payment. It was charged to the defendant, on the 24th of the succeeding month. Notice of the dishonour of the bill was given to the defendant, by a letter from the plaintiffs, bearing date the 31st of January. We forbear, at this time, to notice more of the evidence relative to this bill, lest it should be supposed by the jury, or by others, that the circumstances detailed in that evidence have any influence upon the opinion of the court.

We understand the law to be, that, if a debtor remits to his creditor a bill of exchange, in discharge, or on account of the debt he owes, the creditor may receive it as such, or decline to do so, and return it; or he may present it for acceptance and payment, as the agent of his debtor. If he gives his debtor credit for the amount of the bill, as payment, or in any other manner accepts it as such, it is a payment of so much of the debt. He stands then as an endorser of the bill for consideration paid, and may have his recourse against the drawer and endorsers, in case it should be dishonoured. But if he has been guilty of negligence, in not presenting the bill in time for acceptance and payment, and giving timely notice to all those he means to resort to, of the dishonour of the bill, he stands in the situation of all other holders of bills of exchange. He can never re-charge the bill to his debtor, and do away the credit once given, or to which he was once entitled. This has been decided in this court, in two or three cases. If a doubt could exist, whether this bill was received by the plaintiffs, in part discharge of the debt due to them, and that they had made it their own; their letter of the 31st January, 1807, to the defendant, would be sufficient to remove it. What, then, is incumbent on the holder of a bill of exchange to do. in order to charge the drawer and endorsers, in case it should be dishonoured? He must, in due time, present it for acceptance; and when at maturity, allowing the days of grace, he must present it for payment. If acceptance or payment be refused, he must cause it to be protested, or, at least, noted for non-payment, on the day of refusal; and he must also give timely notice of the same to the drawer and endorsers, against whom he means to resort. What was the conduct of the plaintiffs in relation to this bill? It was noted for non-acceptance on the 6th of November, and was neither presented at maturity, nor protested for non-payment. Payment was not demanded at any time; not even on the 30th of January, upwards of 20 days after it should have been; since it appears by the protest, on that day, that the only inquiry made of the drawees was, whether they would have paid, had the bill been presented in due time? No notice was given of the non-acceptance, until after the informal demand of payment 20 days after it was payable. It is said that the drawers had no funds in the hands of the drawees, and therefore a timely protest and notice were unnecessary. It will readily be admitted, that, if this were an action against the drawers, they could not defend themselves, by alleging the negligence of the holder in these respects, if they had no funds in the hands of the drawees, or had no right to draw upon them. But as to the endorser, it is perfectly immaterial whether the drawers had

authority to draw, or not. The implied contract, which, by his endorsement, he entered into with the holder, was to pay, upon condition that the bill was duly presented and protested, and notice given to him of the refusal of the drawees.

It is contended, that if all these "formalities," as they are styled, had been strictly attended to, still the situation of the defendant would not have been improved, by reason of the failing circumstances of the drawers. If the fact were so, (and there is strong evidence to the contrary,) still the court and jury have nothing to do with considerations of this nature. The rule of law is imperative; and if it were subject to be controlled by such circumstances, it would cease to be a rule.

Another objection made to this credit is, that the defendant, in a letter addressed by him to the plaintiffs, in the year 1809, stated that he had some small deductions to make from his account; which the counsel considers as amounting to a promise to relinquish his claim to this credit. How far he would have been bound by such a promise, had it been distinctly made, is a question not necessary to decide. But, as the defendant, from the time he first had notice of the plaintiffs' irregularity in respect to this bill, had uniformly insisted, that the plaintiffs had made the bill their own,—it would be giving to the general expressions of the letter, a most extravagant and unnatural construction; to make them amount to a promise to submit to the loss of so large a sum of money. This objection, therefore, cannot be sustained.

The last objection made to this credit is, that the bill having been returned to the defendant, and retained by him, to this moment, so far as appears, he ought to be now debited with the amount. The answer to this is obvious. The defendant received the bill, as the agent of the plaintiffs, to collect the amount for the plaintiffs, from the drawers, if he could. He did receive a small part of it from the assignees, and debited himself with the same, in account with the plaintiffs. If, as agent, he has been guilty of any neglect, he is answerable for the same, whenever an action is brought against him, fitted for such a case. That question cannot be investigated in this action, which is for goods sold and delivered.

Upon the whole, the court is of opinion, that if this action were upon the bill of exchange against the defendant, as endorser, the plaintiffs, for the reasons mentioned, could not recover. Much less reason is there, for charging him with the amount of the bill, in this action; or, in other words, expunging from the account, the credit once given; and to which he is entitled in part discharge of that account.

The second question respects the mode of charging interest on the plaintiffs' account. The court need only refer to what was said in relation to this subject, in the case of Barclay & Co. v. Kennedy [Case No. 976], decided at this term. Whether the usage is sufficiently proved by the evidence, is submitted to the jury; as also, whether the mode of charging the interest in this case, is conformable with the usage so proved. We shall make but this observation; that if the usage proved, is applicable only to cases of running accounts, annually stated, and furnished to the merchants here, it will not govern a case where an account is sent, after all commercial transactions have ceased; and particularly where the adding the interest to the principal, has not received the implied sanction of the debtor; but, on the contrary, payment is refused, and a suit is brought to recover such balance. Neither would such a usage authorize the creditor to make other rests in the account—thereby accumulating the amount, by converting the interest into principal.

The last question respects interest during the war. The opinion delivered in the case of Conn v. Penn [Case No. 3,104] continues to receive the approbation of the court. We think, that if the alien enemy has an agent in the United States, or if the plaintiff himself was in the United States. and either of these facts known to the debtor, interest ought not to abate. If the agent be in the state where the debtor resides, a general knowledge of that fact may be sufficient, without bringing it home to the debtor. The debtor might have paid his debt, either to the creditor, or his agent, in this country, without the danger of violating his duty, or the laws of the land. It is said, that the abatement of interest, during the war, upon a debt due to an alien enemy, is a hardship which should prevent the adoption of the rule which this court has approved. If it be so, the rule must nevertheless be enforced, as we do not sit here to establish or to uphold a flexible system of laws, to be bent sometimes one way, and sometimes another, according to our notions of hardship. But even this argument, slight as its influence should be, when aimed against a legal principle, is unfounded in fact; since the creditor may always remove the objection, by having an agent on the spot, authorized to receive the debt.