# Charleston.

## DAVID SURBER'S HEIRS vs. KENT, PAINE & Co. et al.

### January Term, 1872.

The payment of the debts of his decedent, which were created before the war, by an administrator, out of his own funds collected from debts due him prior to the war, in Greenbrier county, in the years 1862 and 1863, at the instance and request of the widow and heirs, and with a view to save the real estate from being sold during the war (the personalty being exhausted), in Confederate treasury notes, is a valid payment or advancement, for which the administrator is entitled to be reimbursed out of the real estate descended.

This was a suit in equity in the circuit court of Greenbrier county, brought to August rules, 1866. The object of the bill was to collect a debt due the plaintiffs, Kent, Paine & Co., from the estate of David Surber. William White was administrator of Surber, deceased, and it appeared from the master's report that he had, in the years 1862 and 1863, at the instance of pressing creditors, and the widow and heirs, advanced largely of his own means to the payment of the indebtedness of the estate. Such payments had been made in Confederate treasury notes, and were the proceeds of debts due White before the war, and collected in such treasury notes.

Surber's widow and heirs were parties defendant with the administrator. A decree was rendered at the September term, 1868, in favor of the plaintiffs, for their debt, and also decreeing that White, administrator, be reimbursed for sundry amounts advanced by him, including the sums advanced in the years 1862 and 1863, in Confederate treasury notes. The decree further provided for the sale of the real estate descended from Surber, to satisfy the debts due.

The heirs of Surber appealed from this decision.

*Price & Sperry* for appellants.
*Dennis & Snyder* for appellees.

The only error assigned and complained of by the appellants is, that the court improperly allowed the administrator the nominal value of the Confederate money advanced by him in the payment of the debts of the estate. And they state, as a principle of law, to sustain this assignment of error, that "a personal representative of an estate cannot buy up the debts of the estate at a discount and charge the estate with the full value of the same."

As an abstract proposition, we are not prepared to say that the appellants have stated the law correctly. It is admitted that a personal representative cannot use the assets of the estate and buy up the debts at a discount and charge the estate with their face value. But the law is not so clear where an administrator, after having fully administered and faithfully applied all the assets to the payment of the debts, that he may not, with his own funds, buy up debts of the estate and hold them against the estate for their full value without regard to what he may pay for them.

But, in the case at bar, it is unnecessary for us to maintain this distinction. In defending the conduct of the appellee, White, we may concede the law to be as comprehensive as stated by the appellants.

Before proceeding further, however, we deem it proper to examine the case as presented by the record, and ascertain, precisely, the matters in controversy. The court will observe that this is an appeal by defendants against a co-defendant; that the appellants have never answered the bill; that there are no pleadings which put any matters in issue between the appellants and appellee; that none of the vouchers or evidences of debt paid off by the administrator, appear in the record; that there is no proof of the kind of money advanced by the administrator to pay off the debts, except his own admission, and he says to obtain the Confederate money thus advanced, he converted *par funds* of his own, and paid dollar for dollar without any gain to himself; that there is neither allegation nor proof to show the character of the currency designated as Confederate money—nothing to show that it was not legal and of par value; that the deposition of M. L. Spotts, Nickell and others, referred to in record, page 32, taken in behalf of the administrator to prove that he had converted

13

his own par funds to discharge the debts of the estate, have been omitted from the record; and that there is no denial anywhere of the facts stated by the appellee, White.

The legal conclusions which follow from these premises are, that the appellants, if they ever had any ground to object to the proceedings in this cause, have waived it, because a defendant, who has not answered, cannot be heard in an appellate court upon any matter which might have been adjudicated in the court below, but was not, for the want of an answer to put it in issue; and *a fortiori*, the appellants cannot here adjudicate, without answer or cross-bill, matters between them-selves and their co-defendant. If they desired to exclude the advancements made by the administrator, upon any ground, they should have put the matter in issue in the pleadings. The fact that the appellants have omitted from the record and failed to except the vouchers paid off and filed in the court below by the administrator, is an admission that they were valid and proper charges upon the estate. And the absence of any attempt to controvert the fact that the administrator, to obtain the money to pay off the debts of the estate, converted par funds of his own and paid dollar for dollar without any gain to himself, admits the truth of the fact thus stated, and for the same reason they omitted the depositions of Nickell and others taken in support of the administrator's testimony on this point. Negatively, thus the case presents itself.

Affirmatively, it appears that in January, 1862, when the appellee, White, took charge of this estate, a great civil war was waging between the loyal and seceding States, the latter known as the Confederate States; that the county of Green-brier was under the control, and within the military lines of the said Confederate States; that the parties to, and the sub-ject matters of this suit, were in said county; that the only currency in circulation in said county, from 1861 to 1865, was Confederate money; that this currency was "impressed upon the country by irresistible force;" that the administrator conducted his administration in the manner which not only he, but the widow and heirs, thought was best for the interest of the estate, and that he acted under the circumstances in good faith and with that care and diligence that a judicious man would have exercised in the conduct of his own affairs;

And, in October, 1866, long after the estate had been fully administered, the present appellants, with a full knowledge of all the facts, stated in writing that they had urged and requested the administrator to make the very advancements of which they now complain. Have they, then, any equity in their pretensions in this suit?

In their exceptions, the appellants style the appellee "an interloper, with no legal rights." Exactly what is intended by this language, we are unable to deduce from any facts in the record. It seems, however, to be an assumption that White was not a legal administrator.

But there is nothing in the pleadings or the proof, to impeach the validity of his qualification. The bill states that he was the administrator, and the bill is confessed by the appellants. Should the court, however, be of opinion that his qualification was invalid, that he should be treated as an executor *de son tort*, still this fact can avail the appellants nothing, for he took charge of the estate with their full knowledge, consent and approbation—not only this, but he managed the estate as requested by them, and after he had fully administered, they ratified his course. "A settlement made by the county court with a *de facto* guardian, *and not complained of in the bill*, will be presumed and taken to be fair by the chancellor,"—*Crook* vs. *Turpin*, 1 B. Monroe, 186, and when the guardian has been guilty of no fraud, the chancellor will treat him as an ordinary trustee and legal guardian, so far as his liability, for whom he acted, is concerned—Id 185.

It is claimed by the appellants, that the administrator paid off various large debts of the estate, in the "worthless and illegal currency of the Confederate States," and that it was error to credit him for the same. It is admitted that the debts, thus paid off by the administrator, were valid debts, against the estate, the larger portion of them being secured by trust deeds upon the realty, and the administrator was bound as security for their payment. At the time these debts were paid, the exclusive currency in that section of the country was Confederate money. This currency had a fixed and ascertained value in the community; it was received at its par value in all the ordinary transactions of business; with it any commodity could be purchased at a fair price, and no

one hesitated to receive it at par in the payment of debts contracted upon a specie basis.  No law of the federal government, and no statute of this State, ever made it a penal offense to receive or pass this currency, or avoided contracts based upon it, or prohibited its circulation.  The supreme court of the United States, and, it is believed, the supreme court of every State which has had the question under review, with, perhaps, the single exception of Louisiana, in some manner, at this time, fully recognize the validity of contracts based upon this currency.  In the case of *Thorington* vs. *Smith*, the supreme court says: "While the war lasted, however, they (Confederate notes) had a certain contingent value, and were used as money in nearly all the business transactions of many millions of people.  They must be regarded, therefore, as a currency, imposed on the community by irresistible force.  It seems to follow as a necessary consequence from actual supremacy of the insurgent government, as a belligerent, within the territory where it circulated, and from the necessity of civil obedience on the part of all who remained in it, that this currency must be considered in the courts of law in the same light as if it had been issued by a foreign government, temporarily occupying a part of the territory of the United States.  Contracts stipulating for payments in this currency, cannot be regarded for that reason only, as made in aid of the foreign invasion in the one case, or of the domestic insurrection in the other.  They have no necessary relations to the hostile government, whether invading or insurgent.  They are transactions in the ordinary course of civil society, and, though they may indirectly and remotely promote the ends of the unlawful government, are without blame, except when proved to have been entered into with the actual intent to further invasion or insurrection.  We cannot doubt that such contracts should be enforced in the courts of the United States, after the restoration of peace, to the extent of their just obligation."  8 Wallace, 11 and 12.  The same doctrine was held in the case of *Dean* vs. *Younell's Adm'r*, id. 14.

The supreme courts of North Carolina, South Carolina, Georgia, Mississippi, Florida, Arkansas, Virginia and Tennessee have all expressly sustained the validity of contracts, the consideration of which was Confederate notes, in the following

among other cases : *Turley* vs. *Nowell*, 1 Phillips N. C. Eq., 301 ; *Philips* vs. *Hooker*, id. 193, 235 ; *Aiken* vs. *Mooney*, 1 Phillips N. C., 31, and id. 471 ; *Austin* vs. *Kinsman*, 13 Rich. S. C. Eq., 259 ; *Witsell* vs. *Riggs*, 14 Rich. S. C., 186 ; *Elder* vs. *Ogletree*, 36 Ga., 64 ; *Bailey* vs. *Milner*, 36 Ga., 330 ; *Cherry* vs. *Walker*, 36 Ga., 327 ; *McMath* vs. *Johnson*, 41 Miss., 439 ; *Martin* vs. *Horton*, 1 Bush., 629 ; also, 40 Miss., 530, 565 and 704 ; *Fife* vs. *Turner*, 11 Fla,, 289 ; *Roane* vs. *Green*, 24 Ark., 210 ; also, id. 269, 540 and 554 ; *Dearing's Adm'r* vs. *Rucker*, 18 Grat., 426 ; *Lohman* vs. *Crouch and als.*, 19 Grat., 331 ; and *Sherfy* vs. *Argenbright*, 1 Heiskell (Tenn.), 128.

In the last cited case, *Sherfy* vs. *Argenbright*, the supreme court of Tennessee, after mentioning a number of cases in which that court had uniformly decided that contracts based upon the consideration of Confederate money were utterly void, and then referring to the painful conflict of decisions by the different States upon such contracts, say : " lt is certainly to be desired that the rule should be the same wherever its application is called for ; that the same measure of justice should be meted to every citizen of the same general government." The court then refers to the cases of *Thorington* vs. *Smith* and *Younell's Adm'r* vs. *Dean*, 8 Wallace, 1 and 14, and proceeds, "and we believing that the holding in these two cases is not repugnant to, but in accordance with, and well sustained by, authority, reason and principle, adopt these judgments as being founded upon the sounder rule in law, and as being in harmony with sound morality, and, as a consequence, *expressly overrule all of our cases in which* a contrary doctrine has been held." 1 Heiskell, 128.

Subsequent to the decisions of this court, in the cases of *Brown* vs. *Wylie*, 2 W. Va. R., 502, and *Calfee's Adm'r* vs. *Burgess*, 3 W. Va. R., 274, in which contracts for Confederate money were held void, it decided the cases of *Jarrett* vs. *Nickell*, 4 W. Va. R., 276 ; *Renick* vs. *Correll, Adm'r, &c.*, id. 627, and *Livesay's Ex'rs* vs. *Beard*, id. 637, in each of which it was held that Confederate money was sufficient consideration to sustain an action, provided the same was evidenced by an obligation executed after the close of the war. The case of *Livesay's Ex'rs* vs. *Beard* was an action on a bond executed in 1866. The defendant filed pleas alleging, in substance, that said

bond was executed in lieu and renewal of another bond, executed by the defendant to the plaintiff's testator, and that the consideration of the latter bond and also of the renewed bond was the treasury notes of the so-called Confederate States. This court held that these pleas were "fatally defective," and affirmed the judgment in favor of the plaintiffs. Thus sustaining a judgment rendered upon a bond of which the only consideration was Confederate money. The other cases above cited were similar to this in almost every respect. If these decisions do not expressly, they do substantially, overrule the cases of *Brown* vs. *Wylie* and *Calfee's Adm'r* vs. *Burgess.* The latter were upon the original obligations given to secure the payment of Confederate money, and the former upon renewals of the original obligations, which had been executed to secure the payment of Confederate money. If there is any distinction, it is more in form than in substance. For if the consideration of a bond is utterly illegal and the bond void and contrary to public policy, a simple renewal of that bond cannot purge the consideration of its illegality, and render the bond valid. *Brown* vs. *Tarkington,* 3 Wallace, 377. This court has also held that the payment of a bond in Confederate money, if voluntarily received, extinguished the debt, although the bond was not surrendered at the time. *Washington's Ex'rs* vs. *Burnett,* 4 W. Va. R., 84, and *Hern and wife* vs. *Hedrick,* id. 620.

We conclude, then, that in view of these decisions, the rulings of the supreme court of the United States and the almost uniform adjudications of the other States, we are fully justified in assuming that it is not the purpose and policy of this court, at this time, to hold that Confederate money is illegal *per se,* and that all contracts, in any manner connected with it, are utterly void, but rather, on the contrary, have we not every indication, from the spirit and tendency of its recent decisions, to believe that it is determined to fall into the almost unbroken chain of decisions of our sister States as well as the federal courts, and hold that such contracts, when honestly entered into, without "any actual intent to further insurrection," should be enforced to the extent of their just obligation.

To ascertain the extent of the recovery in the case under

consideration, upon the principles above enunciated, it becomes necessary to enquire what the Confederate money advanced by the appellee, cost him ? For the estate has no more right to speculate upon the administrator, than the administrator has to speculate upon the estate. Both are entitled to even justice and full indemnity. No more, and no less. The facts already reviewed show, clearly, that the money advanced by the appellee, was the proceeds of solvent bonds due him before the war, and corn sold at fifty cents per bushel, the specie price—that this corn was sold, and these bonds collected at the request of the appellants, for the sole and only purpose of making the advancements here complained of, and that the appellee, who was during the whole war a loyal man, would not otherwise thus have converted his bonds and property into Confederate money. These advancements cost the administrator dollar for dollar in good money, and the court below very properly decreed their nominal value to be the just extent of recovery.

But it is not essential to the success of the administrator in this case, that the court should sustain the legality of Confederate money. The court will observe that this is not a contest between the creditors of the intestate and administrator, but between the heirs and the administrator. The estate is ample to pay off all the debts. Courts scrutinize the conduct of a personal representative much more rigidly in favor of creditors than if it were in favor of legatees. Williams on Executors 1629 (N. 1). But even when the rights of creditors are involved, an executor is justified, if he manages the assets of his testator's estate, as a judicious man, looking alone to his worldly interest would, under the circumstances, pursue in his own affairs.

In the case of *Kee's Executor* vs. *Kee's Creditors*, 2 Grat., 117, the executors were held justified in paying bonds of their testator to the amount of twenty thousand dollars, discounted by an unchartered banking institution, for his benefit, and the consideration of which bonds was the notes of said institution issued contrary to law. And, in the case of *Spencer* vs. *Wilson*, 1 Rand., 76, the issues of such unchartered banks were held to be utterly void. So, in the case under consideration, the court may hold Confederate money to be void, and yet,

104    COURT OF APPEALS OF WEST VIRGINIA.

Jan'y Term,    Surber's Heirs vs. Kent, Paine & Co. et al.    1872

under the circumstances, give the administrator credit for the Confederate money advanced by him. In this case the circumstances in favor of the conduct of the administrator, are equally as strong as they were in favor of the executors in the case above cited. That was a controversy with the creditors of the estate; this is a contest with the widow and heirs of the estate—the parties who urged and advised the course pursued by the administrator.

In *McCall* vs. *Peachy's Adm'r*, 3 Munf., 288, a case in many respects similar to this, the court held that an administrator's conduct appearing to be fair, and proceeding, probably, from good intentions, ought to be sanctioned by a court of equity. See, also, *Thomas* vs. *White*, 3 Little, 177; *Macy's Executor* vs. *Fenwick's Administrator*, 4 B. Monroe, 309. For the principles upon which a court of equity acts in regard to executors and trustees, see *Elliott* vs. *Carter et al.*, 9 Gratt., 557, 558, 559, 560. The principles announced in this case (p. 559, 560,) are sustained by the highest authority, by sound reasoning and good sense. See, also, *Nelson's Executor* vs. *Page, &c.*, 7 Gratt., 160.

There is no pretense of unfairness in the conduct of the administrator in this case. He faithfully applied all the assets of the estate to pay the debts, and then, at the request of the family, and to prevent a forced sale of the realty in the unsettled state of the country, he converted his own property into money, and paid off legal and valid obligations against the estate—the greater part of them liens upon the realty, and for which he was also surety. The estate did not furnish these funds; the appellee paid the debts with his own money, dollar for dollar. It was his right and duty to pay these debts, both as administrator and as surety. If the creditors were willing to take the only currency in circulation at the time, in full discharge of their debts, the estate sustained no loss by having the obligations transferred from the hands of urgent and dissatisfied creditors to the appellee, who was willing to wait until the realty could be sold without sacrifice. The estate, when it pays, in full, every cent thus advanced by the appellee, loses nothing. It simply discharges that amount of valid debts which bound the entire estate, both real and personal. On the other hand, if the appellee is paid the full amount of these advancements, he makes nothing.

He is only paid for the property and bonds which he parted with to make these advancements. Not one dollar of Confederate money of his own did he use—he is not even allowed commission on these advancements. In the language of Pendleton, P., in the case of *Branch* vs. *Burnley et als.:* "He did not carry commodities to market to sell at five times the value for paper to pay this debt, but he collects debts of equal value with that he owed, to pay it, in the ordinary practice of his neighborhood, and under an idea that there was no difference in value between specie and paper." 1 Call, 135 (156).

If the estate is permitted to refuse the payment of the advancements made by the appellee, it makes and he loses just that amount. Justice, equity, good conscience and sound morality, all require that the principles of the decree of the circuit court should be sustained and affirmed.

MAXWELL, J. The only assignment of error in this cause by the appellants is, that they object to the decree for overruling their exceptions to commissioner Walker's report, and supplemental report, so far as said reports and decree allowed the defendant, White, administrator of said estate, the full nominal value of the Confederate treasury notes used by said administrator, of his own funds, in paying the debts of the estate, or rather in buying them up. It does not appear from the decree that the defendant, White, was allowed by the court for all the Confederate treasury notes used by him in paying the debts of his intestate. We are of opinion that he ought to be allowed, under the peculiar circumstances of this case, for the Confederate treasury notes collected by him on debts due him before the war, and applied to the payment of the debts due by his intestate.

It appears from the record that the amount collected by him on such debts, and paid on the debts of the intestate, was two thousand one hundred and twenty-three dollars; and it also appears that the amount paid in money was two thousand seven hundred and ninety-three dollars and fifty-five cents, for which he was entitled to a decree. The decree that was rendered in favor of the defendant, White, is for a certain sum, including interest, with interest on four thousand eight

hundred and nine dollars and eighty-four cents, part thereof, which sum is a fraction less than the aggregate of the two sums named, for which he was entitled to a decree. We are unable to discover any error in the record to the prejudice of the appellants, for which the decree complained of ought to be reversed, and it will have to be affirmed with damages and costs to the appellees.

The other judges concurred.

DECREE AFFIRMED.