RACHEL RODGERS v. J. R. BASS AND WIFE.

1. CONFEDERATE MONEY.—The use of Confederate States notes in private transactions between parties, where it circulated, did not affect such transactions with any taint of illegality or fraud. Within the Confederacy, it was the only circulating medium, and was generally received and passed as money, or token of value, by which debts were paid and exchanges effected.

2. SAME.—Neither executory or executed contracts can be held illegal or void because based on Confederate States treasury notes, and, where of importance in adjudicating such contracts, its value at the time and place where the contract was made should be shown, and the effect of payments and investments in it, by agents, representatives, and trustees, must depend in the main upon the facts and circumstances of each particular transaction.

3. Confederate War—International Law.—It is a rule of international law, that war suspends, for the time, all friendly intercourse between citizens of hostile States; that, while it continues, no kind of business or commercial intercourse can be legitimately transacted by citizens of the one with those of the other; it dissolves commercial partnerships, at the breaking out of hostilities, between citizens of the States in conflict, and revokes the authority of agents in regard to transactions not agreed upon and in part executed. But war does not suspend authority for the collection of a debt, given previous to the beginning of hostilities, by a citizen of one of the hostile States, to an agent, who, as well as the debtor, resides in the other.

4. Power to Collect Debts.—The power to collect a note, given for the payment of the purchase-money of land, may be inferred from the authority to sell the land and take the note in payment for it.

5. Payment.—In the absence of special instructions to an agent to collect in gold or silver currency, a payment to the agent, in bank bills, or other currency generally taken and used in the payment of debts, and current in business transactions as money, would satisfy the debt.

6. Power to Collect.—The legal inference from the authority of an agent to collect a debt is, that he is authorized to receive money, current and at par with coin, usually received, in like transactions, by the community in general where the debt is paid.

7. Same.—Such agent has no authority to sell, or barter, or exchange the note to the debtor, or to any one else, for drafts, bills of exchange, or real property.

8. Same—Money.—Unless the language of the power to collect is qualified or restricted, it should be held as authority to authorize the receipt of currency and bills recognized, in general circulation, as money, rather than to such gold and silver coin, or notes and bills, as are, by the Constitution and laws, declared a legal tender.

9. Confederate Notes.—Tested by these rules, in February, 1862, Confederate States treasury notes, in Texas, must be held to have been current tokens or bills, used and passing, in business transactions, as money; and, ordinarily, an agent, to collect, could receive such notes in payment, unless forbidden by his principal.

10. Payment in Confederate States Notes.—Such payment held good, where made by the maker of a promissory note to the payee, who, as agent, sold the maker of the note land for which the note was executed, in the absence of notice from the owner of the land, that payment to the agent (the payee of the note) would be in fraud of the rights of such equitable owner.

11. Legal Owner of Promissory Note.—Such owner may collect,

and the maker cannot resist an action by such holder, on the ground that some other is the equitable owner.

12. SAME.—Hence, when such legal owner has received payment in the scope of his general authority, the equitable owner cannot maintain suit, and recover again, from the maker.

APPEAL from Gonzales.  Tried below before the Hon. John P. White.

The opinion states the case.

*L. H. Plancke* and *Miller & Sayers,* for appellant.—The record, divested of all surplusage, presents to this court but two questions for its adjudication:

1. Whether James A. Mason had authority to act as the agent and attorney of this appellant, Rachel Rodgers, at the date of the payment of the note which became due 20th of February, 1861, to wit, February, 1862?

2. Was the payment of the note to James A. Mason, in February, 1862, by defendant J. R. Bass, in Confederate treasury notes, a valid legal payment of said note, and binding upon this appellant as the owner of the same?

We propose to present this case with a view of applying the foregoing propositions thereto.

I. We submit that it is an historical fact, that at the time of the payment of the note by appellee Bass to Mason, as the pretended agent of the appellant, a state of war existed between the States of the North and the States of the South, which formerly and since composed the United States, and this historical fact has entered into and become a part of the judicial decisions of the highest tribunals of the country since the termination of said war.

That all intercourse and correspondence between parties domiciled in Northern States, in business relations with parties domiciled in the Southern States, was prohibited, as well by a proclamation of the President of the United States as by an act of the Congress of the United States.  (See Proclamation of President, August 16, 1861; 12 Stats. at Large, 257;

also 12 Stats., 1262; 2 Wallace, 258; Id., 404; 6 Id., 1, 521, 532; 7 Wall., 542; 8 Id., 163; 2 Circuit N. Y., 1870; 7 Blatch., 391; also see opinion of Judge Moore, in Bishop *v.* Jones & Petty, 28 Tex., 314.)

It is a geographical fact, of which this court can judicially take cognizance, that the State of New Jersey, the residence of this appellant, from the year 1858 to the date of the filing of this suit, was one of the States of the North, and that Texas, the residence of the defendant J. R. Bass, and of J. A. Mason, the pretended agent of appellant, was one of the Confederate States which was contemplated as being in a state of rebellion by the proclamation of President Lincoln and the act of Congress above referred to. (See Proclamation of 16th August, 1861, and act of Congress of 13th July, 1861; 12 Stats., 257–1262.)

It is submitted, that by virtue of this act of Congress and the proclamation issued thereon on the 16th August, 1861, all commercial and business intercourse between parties living in the territories of the belligerents was prohibited, and thereby became illegal.

The Northern creditor could not receive the sum of his debt from his Southern debtor, nor could the Southern debtor legally pay his Northern creditor. (See The Kanawha Coal Co. *v.* The Kanawha and Ohio Coal Co., 7 Blatchford, 406, and following; Tucker *v.* Watson, in Court of Appeals of Va., cited; 6 Am. Law Register, 220; Jackson Ins. Co. *v.* Stewart, Id., 732.)

We assume, then, that the power of attorney to J. A. Mason, executed by appellant Rachel Rodgers, on the 3d of April, 1852, by virtue of the existence of a public war between the United States and the Confederate States, was at least suspended during the existence of said war, if not annulled thereby, and the said J. A. Mason became powerless to act as an agent of said appellant to collect the money due her for the note executed for the purchase-money for the land sold by him to appellee before the existence of said public

war, at the time of payment to him by appellee Bass, to wit, in February, 1862.

II. The payment of the money due on said note, by appellee, though it had been made in the gold or silver coin of the United States to the said Mason as the agent of this appellant, was an illegal and prohibited act, in contravention of the statute of the United States, as well as of the established rules of international law governing the rights of parties domiciled in different belligerent territories, and that appellant would not have been bound by the same. (See Ransom *v.* Alexander, 31 Tex., 443; 12 U. S. Statutes, 257; Woods *v.* Toombs, 36 Tex., 86.)

Nor were the relations of principal and agent ever revived between the said appellant and the said Mason since he died, on the 9th day of September, 1864, before the cessation of hostilities between the United States and the Confederate States, which dated from the proclamation of President Johnson, on the 16th day of August, 1866.

It is submitted, that the payment claimed to have been made to Mason, as agent of appellant, by appellee Bass, in the treasury notes of the Confederate States, was null and void, and not binding upon this appellant. (Bowles *v.* Glasgow, 36 Tex., 94; Ransom *v.* Alexander, 31 Tex., 443; Story on Agency, secs. 98, 99, 181, 430; 27 Tex., 574; 21 Tex., 546; 17 Tex., 449; 11 Tex., 764.)

Admit, for the sake of argument, that the power of Mason had not been suspended by the existence of public war between the belligerent parties, the existence of said agency did not authorize him to receive the treasury notes of the Confederate States in payment for the land of this appellant—since that was a class of paper not in existence at the time of the execution of the power; and the receipt of said Confederate money was not authorized by said power; and his act could not be held binding upon this appellant without her special ratification of said act, and she, in her testimony, specially

ignores any such ratification. (Also see Turpin *v.* Sansom, 36 Tex., 143; Lacey *v.* Clements, 36 Tex., 661.)   *   *   *

All of our courts and law writers have been of the opinion that so long as an agent confined his acts within the powers granted, the principal was bound by them, and could not annul them if he wished to do so. (Story on Agency, secs. 126, 165; Merriman *v.* Fulton, 29 Tex., 106.)

And the principal is only chargeable with such acts of the agent as are within the scope of the authority conferred. (Smith *v.* Sublett, 28 Tex., 171)

If a ratification of the unauthorized acts of an agency are relied upon, they must be proved by the party setting it up. (Reese *v.* Medlock, 27 Tex., 120.)

The only act claimed in the answer of defendant to be a ratification, in this case, was, accepting payment of one of the notes sued on, after the commencement of the suit. ·

The acceptance of part of a demand, which is admitted to be due by defendant, even before suit, is not a ratification. (Commercial Bank *v.* Jones, 18 Tex., 811.)

Again it is urged, that the taking the notes in the name of Mason was an unlawful act, and that security upon these notes was a ratification of this act, and therefore a ratification of all other unauthorized acts of Mason, including the payment to him of the Confederate money.

The proof shows (see testimony of defendant Bass, Record,) the mere fact of taking the notes in his own name, for convenience, was not unauthorized by the power, nor unlawful. (Robson *v.* Tait, 13 Tex., 273; Mitchell *v.* McLemore, 9 Tex., 153, 154; Story on Agency, sec. 152.)

The power of attorney to Mason, being a full and general power to sell the lands, included the power to collect the notes (Story on Agency, sec. 85) in any money that was a legal tender for debts, and nothing else.

Hence we conclude, that the whole charge in relation to ratification was not authorized by the pleadings and evidence,

was not correct in law, and compelled the jury to return a verdict for defendant.

*Harwood, Conway & Winston,* for appellee, cited Commercial Bank *v.* Jones, 18 Tex., 812; Story on Agency, secs. 250, 251; Wright *v.* Calhoun, 19 Tex., 422; Hough *v.* Richardson, 3 Story's R., 689; McAlpin *v.* Cassidy, 17 Tex., 451; Merriman *v.* Fulton, 29 Tex., 97; Ritchie *v.* Sweet, 32 Tex., 333; Burleson *v.* Cleveland, 32 Tex., 397; Reed *v.* Nelson, 33 Tex., 471; Clarke *v.* Morey, 10 Johns., 73; Griswold *v.* Waddington, 15 Johns., 64; Buchanan *v.* Curry, 19 Johns., 137; Deniston *v.* Imbrie, 3 Wash. C. C., 396; Thorington *v.* Smith, 8 Wall., —; N. Y. Life Ins. Co. *v.* Clopton, 7 Bush., 179; King *v.* Houson, 4 Call., 259; Mouseaux *v.* Urquhart, 19 La., 485; Coon *v.* Penn, 1 Pet. C. C., 496; Ward *v.* Smith, 7 Wall., 447; Pridgeon *v.* Williams, 21 Grattan, 25; Myers' Executors *v.* Zetelle, 21 Grattan, 733; Hale *v.* Wall, 22 Grattan, 424.

MOORE, ASSOCIATE JUSTICE.—On the 3d day of April, 1852, the appellant, who then resided in the State of Delaware, by letter of attorney, duly executed, authorized James A. Mason to sell a tract of six hundred and sixty-seven acres of land belonging to her, situated in Gonzales county, Texas. On the 20th of February, 1860, said Mason, (who then, and subsequently until his death, in the year 1864, resided in Harris county, Texas,) sold and conveyed said land, under and by virtue of the authority thus conferred, to the appellee, J. R. Bass, in consideration of one thousand dollars cash down, and two notes of said Bass, payable to his, said Mason's, order, for $883.75 each, with interest at ten per cent. per annum from date, due in one and two years from said February 20, 1860, and secured by a mortgage upon the land.

In the year 1858, appellant removed from Delaware to the county of Camden, State of New Jersey, where she has ever since resided, never at any time having been in the State of

Texas. In the month of February, 1862, Bass, at the solic-
itation and special request of said Mason, he being still the
holder of said notes, paid to him, in said county of Gonzales,
in Confederate treasury notes, the full amount of principal
and interest then due on the note, payable February 20, 1861.

It appears, from the evidence found in the record, that at
the time said payment was made, Confederate currency had
just come into circulation in this State, and was received and
used in all business transactions as money, no difference being
made in business transactions between it and coin; that
property of all kinds could be purchased with it at the same
rates at which it was held in specie ; that Bass had taken the
Confederate money, which he paid Mason a few days previous
to its payment, for beef cattle sold by him, at "specie prices."

As Mason died while the war between the Southern and
Northern States was still being waged, it may be inferred
that appellant may not have been fully informed of the pay-
ment of the note for some time after the renewal of inter-
course between Texas and New Jersey. Be this as it may,
the first knowledge which we can say Bass had of objection
by appellant to the payment thus made, was by the bringing
of this suit, August 27, 1872, whereby she claims that the full
amount of principal and interest of both of said notes was
unpaid, and belonged to, and justly due her, and asked judg-
ment for the same, and for the foreclosure of said mortgage.

Subsequently to the commencement of the suit, the note,
which fell due in 1862, was paid. The controversy is now,
therefore, solely in reference to the other note, and turns
upon the determination of the inquiry, whether the payment
of it to Mason, by appellee, at the time this was done, in Con-
federate treasury notes, should be held to be a valid payment
and satisfaction of the debt evidenced by it.

The circumstances which brought, what is usually called
Confederate money, into circulation ; the character of the
transaction of which, so to speak, it was an essential part;
the popular feeling of the great mass of the people where

it circulated, and belief that it was necessary, as long as pos-
sible, to give it currency, and thereby aid the Government
by which it was issued; and, notwithstanding this feeling, its
fluctuations, and rapid depreciation, and ultimate entire
worthlessness, especially while the fierce passions aroused by
the struggle which brought it into existence and kept it in
circulation, and while its heart-burnings and bitter memories
still inflamed the passions and clouded the judgment,—were
well calculated to lead to differences of opinion in regard to
it, and the light in which transactions into which it entered
should be viewed by the courts when called to act upon them.
These differences have been found in our own court, as well
as elsewhere. It seems, however, to be now generally ad-
mitted that its use in private transactions, between parties
where it circulated, did not affect such transactions with any
taint of illegality or fraud; that within the "Confederacy"
it was the only circulating medium, and was generally re-
ceived and passed as money, or token of value, by which
values were to a great extent fixed, and debts generally paid
and exchanges effected; that it had a value, though greatly
varying in different localities and at different periods, as
compared with silver and gold coin, which, for the time, were
commodities for trade rather than money for circulation,
and, therefore, neither executory nor executed contracts can
be held illegal or void, because based upon it; and where
of importance, in adjudicating such contracts, its value at the
time and place where the contract was made should be shown,
and that the effect of payments and investments in it by
agents, representatives, and trustees must depend, in the
main, upon the facts and circumstances of each particular
transaction. (Atkin *v.* Mooney, Phil. (N. C.) Law, 31; Robinson
*v.* International Life Assurance Society, 42 New York, 54;
Davis *v.* Mississippi Central Railroad Co., 46 Miss., 552;
Martin *v.* Horton, 1 Bush., 629; Rodes *v.* Patilla, 5 Bush., 271;
Emmerson *v.* Mallit, Phil. (N. C.) Eq., 234; Walker *v.* Page,
21 Gratt., 636; Thorington *v.* Smith, 8 Wall., 1; Myers's

33

Ex'rs, *v.* Zittelle, 21 Gratt., 733; Hale *v,* Wall, 22 Gratt., 424; Green *v.* Seirzer, 40 Miss., 500; Planters' Bank *v.* Union Bank, 16 Wall., 483; Bond *v.* Perkins, 4 Heisk., 564; Westbrook *v.* Davis, 48 Ga., 471; Suber *v.* Kent, 5 West Va., 96.)

It necessarily follows from the rulings in the cases just cited, now generally regarded as correct, that when a party, capable of contracting, has made a contract, which is free from all fraud or imposition, he will not be permitted to avoid it, whether it is executed or executory, on the ground that the consideration for it was Confederate money. But when a contract was made, or money collected by one who acts not for himself, but as the representative, agent, or trustee of another, the validity of the contract, or effect of the payment in discharge of the debt, depends upon the fact, whether the power, under which such party acts, authorized him to take Confederate money, or whether the circumstances surrounding the transaction, or the previous action of the principal, justifies the party dealing with him in concluding that the agent had authority to exercise his discretion in the premises.

As appellant brings this suit to recover upon the notes given Mason by appellee in part payment for the land, it must be inferred, whether it appears upon the face of the letter of attorney or not, that Mason was authorized to sell upon the terms he did, and to take the notes, payable to his own order, for the deferred payment. But, as it is inferable from the evidence that the equitable right to the notes was in appellant, and the proceeds from them, when collected, belonged to appellant, if the one here in controversy has not been satisfied and extinguished by appellee's alleged payment of it to Mason, as appellant's agent or as the legal holder and payee of it, the judgment against her should be reversed.

Appellant's right to a recovery in the case involves the determination of one or both of the following questions:

First: It being conceded that appellant was the equitable

owner of the note, and entitled to the money for which it was given, and being a citizen of one of the States adhering to the Union at war with the Confederate States, did Mason have authority to collect or receive the money due upon it at the time it was paid?

Second: If Mason was authorized to collect the note, was he authorized to receive Confederate money in payment thereof, and would such payment relieve the maker from liability to the party to whom the note equitably belonged and for whom the payee held it merely in trust?

It cannot be questioned that it is a universally-recognized general rule of international law, that war suspends for the time all friendly intercourse between citizens of hostile States; that while it continues no kind of business or commercial intercourse can be legitimately transacted or carried on by citizens of the one with those of the other, unless specially authorized by government; and so general and pervading is this principle, that war is held to dissolve *ipso facto* commercial partnerships existing at the breaking out of hostilities between citizens of States at war with each other, and to revoke or supersede authority of agents in regard to transactions not agreed upon and in part executed, and especially such as confer authority to buy and sell property. But, nevertheless, it seems to be equally well settled that war does not revoke or suspend authority for the collection of a debt, given previously to the beginning of hostilities, by a citizen of one of the hostile States to an agent, who, as well as the debtor, resides in the other. (Clarke *v.* Morey, 10 Johns., 73: Paul *v.* Christie, 4 H. & McH., 161; Denniston *v.* Imbrie, 3 Wash. C. C., 396; Mouseaux *v.* Urquhart, 19 La., 485; Griswold *v.* Waddington, 15 Johns., 64; Buchanan *v.* Curry, 19 Id., 137; Coon *v.* Penn, 1 Pet., 496; Ward *v.* Smith, 7 Wall., 44; Fisher *v.* Krutz, 9 Kan., 501; Grover *v.* Carter, 3 Hawk., 328; and cases previously cited.)

What, then, was the effect of the payment of the note to Mason in Confederate money? The power to collect the

note may be inferred from the authority to sell the land and take the note in payment for it; and as no instructions were given, requiring its payment exclusively in gold and silver coin, if it had been paid before the war between the States began, it cannot be denied that Mason would have been authorized to have received in payment of it current bank-bills, or other tokens generally taken and received in payment of debts and current in business transactions as money. (United States Bank *v.* Bank of Georgia, 10 Wheat., 347.) The creditor, of course, has the right to exact the payment of his debt in such money as the law declares to be a legal tender. Why, then, may the agent, who is authorized merely in general terms to collect, without anything being said as to the character of the money in which he is to do so, receive payment in that which is not a legal tender? Unquestionably, because, by the authority given the agent, without restriction as to the kind of money he shall receive, it must be inferred that the principal intended, and his agent, as well as the debtor, understood, that he was willing for his debt to be paid in such bank-bills, or other currency, as was generally taken and received by others in payment of debts. The legal inference from the authority given an agent to collect a debt is, that he is authorized to receive money, current and at par with coin, usually received in like transactions by the community in general where the debt is paid. The agent, therefore, has no authority to sell, or barter and exchange the note to the debtor, or any one else, for drafts, bills of exchange, or any kind of personal or real property. The inference to be deduced from the general authority given the agent to collect is, that he must do so in money. But in what kind of money shall this be done? Is it to be understood that, in such cases, the word "money" is to be taken in its most restricted and limited sense, and should be held to refer to such gold and silver coin, or notes and bills, as are, by the Constitution and laws, declared to be a legal tender; or is it to be taken and interpreted according to its popular use, and held to authorize the

receipt of currency and bills recognized in general circulation where the debt is to be paid, as money? We answer, in general, unless the language of the power is qualified or restricted, it should be held to import the latter. It therefore shows that such an agent is authorized by the power to receive whatever is generally recognized and treated in business transactions as money, and is at par, and readily convertible into money, made by law a legal tender, for the payment of debts, or where the discount upon it is so little as to have no material effect upon its general circulation and value.

Tested by these rules, we are of opinion that Confederate money, at the time and place of its payment to Mason, must be held to have been current tokens, or bills, used and passing in business transactions as money at their par value; and hence, it should ordinarily be inferred that an agent would have been authorized to receive them, unless forbidden to do so by his principal, or restrained by express or clearly implied limitation in the power under which he acts. (Story, Prom. Notes, sec. 500, *et seq.;* Miller *v.* Race, 1 Burr, 452; Grant *v.* Vaughan, 3 Id., 1516; Gorger *v.* Mirville, 3 B. & C., 45; Mann *v.* Mann, 1 John. Ch., 230; Coleman *v.* Wingfield, 4 Heisk., 133, and case previously cited.)

It is claimed, however, that the payment of this note in Confederate money is not to be regarded in the same light as if appellant had been a citizen of the Confederacy. It is argued, as appellant was a citizen of the State of New Jersey, where Confederate money would have been entirely worthless, and if not, as it would have been in violation of law for her to attempt to have made use of it, if it had been remitted to her, and as it cannot be supposed that she desired to lay up as an investment note put in circulation by, and having no security for their payment but the promise of an illegal and revolutionary government, as regarded by the loyal citizens of New Jersey, it is not to be supposed that appellant would have received such money in payment of the note, if it had been tendered directly to her. This interpretation of the

power of collecting agents for non-residents of the Confederate States seems to have received the approval of the Supreme Court of the United States, (Fritz *v.* Stone, October Term, 1874,) and also of the Court of Appeals of Virginia, (Alley *v.* Rogers, 19 Gratt., 381.) In both of these cases, however, it appears that there had been considerable depreciation in the value of Confederate money before its payment to the agents. The authority of Alley *v.* Rogers seems also, to some extent, weakened by the case of Pridgeon *v.* Williams, 21 Gratt., 251, in which the collection of a judgment in favor of a non-resident, by his attorneys, in Confederate money, before it had depreciated but little in value, was held to be valid. It may be also noted that in Fritz *v.* Stone, it is said: "The authority to collect was based on the power to remit, and that, it was impracticable, as well as unlawful, to do." It is certainly not to be presumed that it is necessary or even usual for the agent to remit the identical money he receives to the foreign creditor. But he will almost invariably do this by bill of exchange, whether the debt has been collected in bank-bills or coin: and during the war it would have been just as illegal for the agent to have remitted gold as Confederate money. But had it been remitted, it is a conceded fact, that at the date of the payment to Mason, Confederate money was worth, in the city of New York, as much as the legal-tender notes of the United States, and was as little below par with gold as these notes have been from that day to this.

It is not necessary for us at present to determine whether the agent, under similar circumstances as in this case, would have had authority to receive Confederate money in satisfaction of a note payable to a resident of that part of the United States with which we were carrying on war. This note was payable to a citizen of this State. It is true, appellee knew that it was given for land which belonged to appellant; but he is not to be supposed to be cognizant of the object and purpose of appellant and her attorney in having the note made payable to the agent. Being payable to Mason, he did

not need a power of attorney from appellant authorizing him to collect it. Unless appellee was notified, or had information from which he should have concluded that, though the note was payable to and in possession of Mason, its payment to him would operate as a fraud upon appellant, he certainly could make no opposition to Mason's collecting it in such manner as he thought fit. (Murrell *v.* Jones, 40 Miss., 565.)

It has been frequently held by this court that a debtor cannot resist a suit upon a note by the party in possession of it, with the apparent legal right, on the ground that he is not in fact the owner, but that in equity it belongs to some one else. (Thompson *v.* Cartwright, 1 Tex., 87; De Cordova *v.* Atchison, 13 Tex., 372; Butler *v.* Robertson, 11 Tex., 142; Wimbish *v.* Holt, 26 Tex., 672.)

Had the courts been open when appellee paid the note, Mason could have forced him to pay it; and surely it cannot be held that one may not voluntarily discharge a debt to a party to whom the law, if appealed to, would give a judgment. From the evidence, there seems no reason to doubt that appellee acted with good faith and entire fairness. This is not a case of an attempt to be relieved from a just debt by its payment in a depreciated and worthless currency, through the pressure of popular sentiment or military orders. It was made on the solicitation of the payee and holder of the note, at a time when Confederate money was eagerly sought for by almost every one, and when it could be readily invested in property on the same terms as gold and silver coin; and although appellant may have derived no benefit from it, to require appellee to pay the debt a second time, would be palpably unjust. If appellee has cause of complaint against any one, it is of her agent, and not appellee.

The judgment is affirmed.

                                                    AFFIRMED.