## CALEB HYATT, Respondent, *v.* FELIX ARGENTI, Appellant.

A party depositing securities for securing the payment of a debt, or advancements made thereon, may agree that they shall be sold, at the option or pleasure of the creditor.

And where the plaintiff drew several drafts upon the defendant, who held the deposit, directing him to pay them "from the proceeds of the securities in his hands," this was held to give an authority to the plaintiff to sell the securities deposited to meet the drafts.

An order to pay "when in funds, from the proceeds," makes the deduction conclusive, that other sales had yet to be made by the defendant.

A sale made under such authority, is good without notice to the plaintiff of the time and place of sale, or previous demand of payment.

Personal property may be pledged, mortgaged, hypothecated, or placed in trust, upon such terms and conditions as the parties may agree upon, and courts of law will be governed by the language of the contract in each particular case.

When such contract is absolute upon its face, the party asserting a condition or limitation, must show it.

APPEAL from the Fourth Judicial District.

The complaint set forth, that plaintiff, being the owner of city scrip of the City of San Francisco, to the nominal amount of $45,215 60, bearing interest at the rate of 3 per cent. per month, and requisitions of the Comptroller upon the City Treasurer for moneys due to plaintiff for planking streets, to the

nominal amount of $94,748 62, and bonds of the city to the nominal amount of $90,000, bearing 10 per cent. interest per annum, deposited the same with the said defendant, to hold as his agent, and charges that defendant had fraudulently converted the same to his own use, in the course of his employment as agent as aforesaid, to the damage of plaintiff $60,000, and prays judgment, &c., which complaint was sworn to, and filed by defendant 21st January, 1852.

Defendant, in his answer, denies specifically every allegation of the complaint, and avers that plaintiff is not the party in interest; and then admits that certain securities, being a portion of those mentioned in the complaint, were hitherto hypothecated with him by the plaintiff, and others connected with him, and pledged as collateral security for the prompt payment by him of certain advances made by defendant to plaintiff, and for debts and accounts then due from plaintiff to defendant; and for such other advances as should be afterwards made to plaintiff by defendant, and to cover all subsequent advances made upon his account; and that, by an agreement made between them, at the time of the hypothecation aforesaid, the defendant had the right to *sell without notice*, any or all of said pledges or securities, in the event of any of the said advances being unpaid, and to apply the net proceeds of such sales to the payment of such unpaid debts and advances, &c.; and avers that there were and are still existing, debts and advances due from plaintiff to defendant. And that under the power conferred on him by plaintiff, he did sell the said securities so hypothecated, from time to time, and applied the proceeds to the payment or part payment of said outstanding debts, &c.; and after the entire application of said net proceeds as aforesaid, there is still due and unpaid from plaintiff to defendant, the sum of $12,750, with interest at the rate of 5 per cent. per month; and defendant makes the said debts, advances, and the balance due, a counter claim in this action, and prays judgment in his favor, &c.

This answer was sworn to by M. Berri, the attorney in fact for defendant.

This cause occupied much of the time of the court below, and the testimony taken in the course of the trial is very voluminous.

The facts, so far as they are deemed material, in reference to the view taken of the case by this court, appear to be as follows :—,

The firm of Hyatt, Cox & Sheldon had a contract with the City of San Francisco, for planking certain streets of the city, and applied to the defendant Argenti for aid, who agreed to assist them, and with whom they opened an account, giving first to the defendant their endorsed note for $5000, which the defendant passed to their credit; this note bore interest at the rate of 7 per cent. per month.' Without taking up the note when it fell due, the firm arranged with the defendant for further credits, by transferring to him their claims under their contract with the city (specified in the complaint), which transfer was absolute upon its face. These claims were in the form of what was called "requisitions," which were estimates of work done, certified by the Street Commissioner, and otherwise authenticated. By these transfers, defendant claimed to be invested with the whole legal title to, and control over, the said securities, subject to the equitable interest of the said firm in the premises. Upon the securities thus transferred, the defendant proceeded to make advances to the firm, and also agreed to reduce the interest with which the account commenced, from 7 to 5 per cent. The "requisitions" were all transferred in October and November, 1850, and the money nearly all advanced in October and November. Up to that time the whole amount of cash advanced was $43,590; the amount of requisitions transferred to defendant was $      which were partly collected in cash by him, part in scrip, and part were funded. On the 18th February, the defendant rendered an account current to the firm, in which they are credited with the cash received by him, except about $4000, the scrip and requisitions to be funded, remaining in defendant's hands. This account showed a balance due defendant of $19,993 63. On the 22d February, defendant paid a judgment against the firm of some $3400; and on the 31st July, rendered another account current, showing a balance then due him of $24,011 45. It does not appear that any exception was taken by the firm or by defendant to either of these accounts.

It appears that the accounts between the parties stood thus till September 6th, 1851, when defendant sold part of the scrip,

and continued to make sales down to January 5th, 1852, when he closed up the account. As the sales were effected, the proceeds were carried to the credit of the firm on defendant's books, which, it is in evidence, Hyatt, the plaintiff, had access to, and frequently examined. On the 5th January, another account was rendered by defendant, crediting the entire sales, and leaving a balance due to him of $2677 28. It does not appear that any direct notice was given by plaintiff to defendant, or the firm, of the sales of the securities made by him, which appear to have been private, or made through brokers selected by the defendant. It was in evidence, however, that in October (24th), 1850 (the arrangement between the parties having been made in September preceding), that the firm drew upon defendant, first for $8000, and then for several other sums, of $2000, $6000, $3086 61, and other sums, directing him to pay the same in each of the drafts, " from the proceeds of the securities now in your hands, and such other securities as will hereafter be placed in your hands by us." And on the 27th December, the firm drew another draft upon defendant for near $8000, made payable " when in funds, from the proceeds of the securities placed in your hands by us, after deducting the amount due you for cash advanced, and the interest on the same."

It was in evidence, that on the 13th March, 1851, Cox & Sheldon, two members of the firm, had assigned all their interest therein to defendant Hyatt.

The case was submitted to the court without a jury, who found the amount of scrip hypothecated to be $80,636 75, which was payable two-thirds in cash, and one-third in city scrip ; the amount of scrip received by defendant upon the requisitions ; and that the scrip had been converted by the defendant to his own use (after the assignment of Cox & Sheldon to plaintiff, and prior to November 1st, 1851), in part by private sale, without notice to plaintiff, and in part by funding them, mixed with other scrip, with the commissioners of the funded debt of the city, without the knowledge or consent of the plaintiff; and also, that the requisitions had been converted in like manner ; and also, that the scrip had been sold in the market (the highest rate), November 2d, 1850, at 10 per cent. premium, and requi-

sitions, January 8th, 1851, at 5 per cent. discount; and that, taking these sales as data, the damage sustained by plaintiff by the conversion, amounted to $53,840.

Several other facts were found by the court, which do not appear to have any bearing upon the case, as considered by the Supreme Court.

The facts and data thus found, together with an open account of plaintiff against defendant, were referred to the clerk of the court, to state an account between the parties, who reported a balance due to the plaintiff from the defendant, of $36,977 98, for which judgment was entered by order of the court.

A motion was made by defendant for a new trial, which was overruled, and this appeal was taken.

*M'Dougal*, for appellant.

The defendant was in no respect the plaintiff's agent, nor was he a pledgee: 2 Bouvier, Pledge, 3, 4; Story's Bailment, 286; Jones on Bailment, 117; nor mortgagee: Bouvier, Pledge, 6. The distinction between a pledgee and a mortgagee is, that it is created by a grant by which the whole legal title passes conditionally. The securities were transferred in writing, without any condition. Defendant held them in trust to pay his debt, and account for the surplus. 2 Bouv. 605; Levin Trustees, 15; Saund. 6.

If defendant was a trustee, he is amenable only to the equitable jurisdiction of chancery; and proof of this will not sustain a proceeding in tort, based upon legal title to the thing converted, and charging agency, or a naked bailment for safe keeping.

But the defendant was a trustee, with power to sell for the purpose of reimbursing himself. He had the right to do with them what was necessary and proper for his own protection, doing it in good faith, and using prudence. The assignments are absolute on their face, and carry with them the full *jus disponendi*. There is no testimony showing that this power was qualified, and this can only be gathered by defendant's answer, and this asserts the power to sell also, and these must be taken together.

That the trust was to be executed by a sale of the securities,

is shown by defendant's conduct throughout. The firm drew on defendant a great number of sight drafts, when they had no money in his hands, "*payable out of the proceeds of securities held by him*." If defendant had been a mere agent, and held securities for the purpose of providing funds, and such a draft had been presented and refused, he having undertaken to provide funds out of the proceeds of sale, which fact the drafts assume, he would have been liable in damages.

Hyatt examined the books of defendant frequently, which contained the entries of the sales, and never objected.

But, if there were no original power to sell, the conduct of plaintiff amounts to an acquiescence, and he will be held to have approved the sales; his examination of the books, knowledge of the facts, and receipt of accounts current without disapproval, is a virtual approval. Levin, 639, 640–1; 17 Veng. 326.

The rendition of the accounts current was a liquidation and settlement of the accounts, no objection being made. 10 Barb. 215; 2 Ib. 586; 2 Greenleaf Ev. 127, 8; 4 Bing. 459; 3 Cor. & Payne, 236; 2 Brod. & Bin. 99; 13 Earl, 249.

The argument of the counsel embraced other points made in the case not considered by this court.

*Brooks*, for respondent.

The requisitions and their proceeds, were pledged with defendant by plaintiff, and could not be sold without demand of payment, and notice of the time and place of sale. 4 Den. 227.

Such sale is a conversion, and the rule of damage is the highest value between the time of conversion and the time of trial. 3 Con. 82; 7 Ib. 681; 1 Ib. 240; 3 Comstk. N. Y. Rep. 78; 1 Sanford, 361; 20 Wen. 94; 22 Ib. 348, 366–7; Paine, 626; Sto. Bail, sec. 122, 191, 269, 290, 308, 318, 321, 322, 396.

A note may be pledged, and the transfer of the legal title is necessary to carry the possession, but this does not alter the character of the transaction, and cited Wheeler *v.* Wheeler, 9 Cow. 24; see, also, 1 Sandfd. S. C. Rep. 248. Abuse of lawful possession is breach of trust, and amounts to a conversion. 3 Johns. 432; Salk. 130, 154; 2 Bos. & Pul. 453.

An absolute transfer of a promissory note may be shown to be

collateral.   2 Hill, 140; Sto. Prom. Notes, sec. 284; 20 Johns. 634, 640, *et seq.*; 1 Bos. & Pul. Collins *v.* Martin; Chitty on Bills, 74, n. 2, and page 198, n. 2; 19 Johns. 66; 10 New Hamp. R. 264.

If the court are satisfied that the transaction is a pledge, there is then no error in the ruling of the court below.

The opinion of the court was delivered by HEYDENFELDT, Justice.

This is an action of trover for the wrongful conversion of certain securities, called scrip, requisitions, and bonds.

The defendant was to make advances of money from time to time to the firm of Hyatt, Cox & Sheldon (who, in this action, are represented by the plaintiff Hyatt), and Hyatt, Cox & Sheldon were to place the securities, as fast as received, in the possession of defendant, accompanied by an absolute assignment in writing.

Various amounts were drawn by Hyatt, Cox & Sheldon from defendant, and the securities, placed in the hands of the latter, were sold at different times for their market value, and placed to the credit of the firm.

These securities subsequently appreciated in value in a great degree.   The plaintiff now insists that the defendant had no right to sell them without notice to him, and is, therefore, guilty of a conversion.   Upon the facts set out in the bill of exceptions, the court below decided, that by the rules of law, the defendant had no legal authority to sell or dispose of the securities, and was therefore guilty of converting them to his own use.

Much argument and authority has been displayed upon the question, whether the holder of a mortgage or pledge of securities or personal property can sell when the debt becomes due, without notice to the mortgagor.   From the evidence contained in the bill of exceptions, we think the consideration of that question is unnecessary.   It will not be doubted that a party depositing such securities may agree that they shall be sold at the option or pleasure of the creditor.   And we can come to no other conclusion, than that such was the contract in the present case.   It

appears, according to the bill of exceptions, that the engagement between the parties took place in September, 1850.

On the 24th October following, the firm of Hyatt, Cox & Sheldon, drew a draft on defendant directing him to pay, on the 30th October, to the order of H. Meigs, eight thousand dollars, "from the proceeds of the securities now in your hands, and such other securities as will hereafter be placed in your hands by us."

On the same day, another draft was drawn by them for two thousand dollars, payable on the 26th, using the same language.

On the same day, another, payable at sight, for two thousand dollars, and in the same terms.

On the same day, a third draft, payable the 20th November following, for six thousand dollars, at sight, and in the same terms.

On the 8th November, another draft, at sight, for $3086 61, in the same terms.

And on 29th December, a draft is drawn by them for $7952 03, payable "when in funds from the proceeds of the securities placed in your hands by us, after deducting the amount due you for cash advanced and the interest on the same, and also the amount due McCoudray." An express stipulation in writing could not exhibit more clearly the authority of the defendant to sell the securities, than does the language of these drafts. The money drawn for, was to be paid from the proceeds; proceeds can only be obtained by sale, and the language of the last-mentioned draft, "when in funds from the proceeds," makes the deduction conclusive, that other sales had yet to be made by the defendant.

It appears, moreover, from the evidence of Meigs, one of the plaintiff's witnesses, that he informed the plaintiff of the sale of the bonds, and the price for which they sold, at which he says, "Hyatt objected to the price at which the bonds were sold, and said it was eating him up." This is the language of a man complaining of hard fortune, but certainly not of breach of contract, or of bad faith, and it is pregnant with the admission of the right of the defendant to sell.

This view of the case renders it unnecessary to consider the other assignments of error. It is clear to our minds that the defendant is not guilty of conversion, and the plaintiff has mistaken his action. If the defendant is indebted to him, his proper

remedy is within the equitable jurisdiction of the court by bill for an account.

The judgment is reversed, and a nonsuit against the plaintiff is ordered with costs.

WELLS, Justice, delivered the following opinion, concurring with the opinion of Mr. Justice HEYDENFELDT.

The city scrip and requisitions, alleged to have been fraudulently converted by the defendant to his own use, were transferred to him by assignments in writing, absolute on their face, for value received, and carrying with them the *jus disponendi.* But it is insisted, on the part of the plaintiff, that notwithstanding the absolute transfer of the property and legal title in these securities, still they were, in truth and in fact, only held by the defendant in pledge, as collateral security; and being so held, that the sale of them by defendant without demand of payment, and notice of the time and place of sale, was a conversion, and a fraud upon the plaintiff.

The rule of law as stated is doubtless correct as applied to a proper case, and the point here is, whether such a case is presented as renders the rule applicable?

It will not be denied that collateral security may be held in as many various ways and subject to as many different conditions, as there is variety in the objects and character of contracts; thus: personal property, merchandize, or stock, may be held as collateral security, in the nature of a mortgage, in which the parties could agree that in case of non-payment, the right of property should become absolute, and that, without notice or foreclosure; or, it may be held as a pledge, the right of restoration upon the payment of the debt, being reserved to the debtor; and it is competent for the parties to contract, that the goods or stock thus pledged as collateral may be sold with or without notice, and upon non-payment without demand of payment. So, also, goods or stock, or other securities, may be held by the creditor under an absolute transfer, in trust for the debtor, with the power in the creditor to sell and reimburse himself for advances made, or to provide himself from time to time with funds to meet the additional demands of his debtor, and to pay his drafts, or in other

words, it is competent for parties to form these contracts to suit themselves, and courts of law will be governed by the plain import of the language of the contract in each particular case.

The transfers of the property in the present case were, as we have seen, absolute upon their face, and carried with them the undoubted and unrestricted right in the defendant to sell, and convey, and convert at his pleasure; and if that right was qualified or limited in any manner, or controlled by an agreement between the parties to the contract, that fact must be established. It is conceded by the defendant in his answer, and upon the argument, that he was intrusted with these securities for the purpose of indemnifying himself for advances made, and that he had the right to do with them whatever might be necessary or proper for his own protection; and he especially sets up, that it was distinctly understood that if the moneys advanced should remain unpaid, after becoming due, he should have the right to sell without demand and without notice; beyond this admission of defendant, there is no proof whatever to show that the transfer of the property to him was in any degree qualified or conditional, and if taken as evidence against him, must be taken in connection with the allegation of his right to sell. It is said by the court below, that this is a pledge in its strictest sense, and upon this assumption, it rules that therefore the creditor had no legal authority to sell; but this assumption cannot be maintained. I do not question, that if this were merely a pledge on deposit of the securities, to secure the payment of a certain sum of money upon a future day, without the power of sale, that the right to redeem and to a restoration of the property would be reserved to the creditor, and that sale could not be made without previous demand of payment and notice; but this cannot be assumed in this case in the face of the absolute transfer and power to sell; and upon the state of facts shown, the legal presumption cannot be raised. On the contrary, the legal presumption is, that the transfer being absolute, the right to sell and dispose of the property was perfect; and even though it could be said that this was strictly a pledge, yet the pledge was accompanied by the unqualified power to sell without demand and without notice. And who shall say that such was not the intention of the parties? It was perfectly com-

petent for the plaintiff to agree that the defendant should have the right to sell and dispose of the scrip, to convert the requisitions into bonds, and to dispose of them at such times and at such places, and in such manner as he should deem best and most prudent for the interests of all parties; and, indeed, it was consistent with the defendant's interest that he should have such power for his own protection, and to reimburse himself for advances made, and equally so with the plaintiff's object to reduce the amount of interest, which he complained was "eating him up;" and it was consistent also with the terms of the contract, and with the employment and occupation of the defendant in connection therewith.   Moreover, no proof of any character whatever is adduced to establish the fact, that this full and complete power of sale was not intended to be given.   The position of the court below, and the respondent here, is based solely upon the rule of law that in case of a naked pledge as collateral security, the authority to sell, when not expressly given, cannot be exercised without demand of payment and notice.   As I have already stated, this is not such a case, and the rule is therefore inapplicable.   An examination of the cases cited by the respondent, and relied upon by him as authority, will show wherein the rule fails to apply.   In the case of Wilson *v.* Little, 2 Comstock, p. 443, the plaintiff, through his broker, negotiated a loan of $2000 with Little & Co., and gave, as collateral security, fifty shares of Erie railroad stock.   The contract was in writing, in the shape of a promissory note, which set forth that the plaintiff had deposited the stock described with the defendant, as collateral security, *with authority* to sell the same on *the non-performance* of the promise, without notice; and at the same time he made a transfer of the stock on the books of the company to the defendant.   In deciding the case, the court, per RUGGLES, Justice, says, "In the present case, the note for the repayment of the loan and the transfer of the stock were parts of the same transaction, and are to be construed together.   The transfer, if regarded by itself, is absolute, but its object and character are qualified and explained by the contemporaneous paper, which declares it to be a deposit of the stock as collateral security for the payment of $2000;" and it was there held, that the creditor

11

could not sell the same until he had first demanded payment of the debtor; but it will be observed also, that there the creditor sold before demand, and that the note was payable on demand, and the authority to sell was given only in case of non-performance. So also in Allen *v.* Dickens & Allstyne, 3 Hill, 594. In that case there was a loan of money, and a promissory note for the payment of the amount, in which it was stated that the borrower had deposited with the lenders, as collateral security, with authority to sell the same *on non-performance* of the promise, 250 shares of a certain stock therein mentioned. The money in that case was payable in sixty days; the sale was to be made at the board of brokers, and notice waived if not paid at maturity. The court held, that the sale was a conversion, for the reason that the defendants had not *demanded payment* of the plaintiff before selling; but the ruling of the court was placed upon the ground that the power to sell was expressly restricted by the terms of the contract, and was granted only in case of *non-performance*, and therefore that demand of payment was necessary. It will be borne in mind, also, that in that case the stock was converted before the maturity of the note. The rule in the case of Stearns *v.* Marsh, 4 Davis, 227, also cited and relied upon by the respondent, is based upon the same principle, and depends upon the written contract of the parties. It was where a number of cases of boots and shoes were pledged as security for a debt coming due, and payable at a future day; it was held that the creditor could not sell the same until he first called upon the debtor to redeem the pledge; and that he must also give him notice of the time and place of sale. These decisions are based upon the principle, that where personal things are pledged for the payment of a debt, the general property and the legal title always remain in the pledger; the special property and the possession, or right of possession, being in the pledgee; the pledger having the right to restoration of the property on payment of the debt. In the cases of the transfers of stock, the courts say, that the special property only passed; that the contemporaneous paper, or note in writing, showed that the transfer, although absolute on its face, did not convey the *general property*, or the *legal title* to the property, but it was resorted to from

necessity, arising from the by-laws of the corporations of whose capital stock these shares were a part, which required the transfer of the certificate to be made upon their books; and that this absolute transfer was necessary to give the creditor possession of the· stock, and for his own protection.   So in the matter of the cases of boots and shoes, the general property and the legal title to the property remained in the debtor.   The character of the several transfers in each of these cases is qualified, and this is shown by the contracts in writing; and in each case the right to sell was restricted and denied, except in case of non-performance; and undoubtedly the decisions were governed by the written contract in each case; none of them can therefore be said to be analogous to the case at bar.   The decision in Wilson *v*. Little, by. the New York Court of Appeals, and which reviews both of the other cases, is placed distinctly upon the written contract.   The court says, in addition to what has been above quoted, "The general property which the pledger is said usually to retain, is nothing more than a legal right to the restoration of the thing pledged, on payment of the debt.   Upon a fair construction of the note and the transfer, taken together, this right was in the plaintiff," &c.   The transfer in that case being absolute, it was qualified and explained only by the contemporaneous papers, which declared it to be a deposit, and restricted the right to sell.   In the present case, the transfer is absolute, and there is nothing adduced on the part of the plaintiff to qualify or explain it, except the drafts, which were drawn, at or about the time of the transfer by Hyatt, Cox & Sheldon, on the defendant: these drafts we will examine presently.   The answer, it is true, as we have already seen, admits that the securities were held as collateral, but the admission is coupled with the averment that the defendant had the full power to sell; they cannot be separated,—the admission and averment, if taken at all, must be taken together; and giving the parol testimony of the witness, Squiers, the fullest weight that can be asked for it, viz., that the defendant held the scrip, &c., as collateral, and yet it by no means follows that the defendant has not the right to sell.   The plaintiff had yet something more to do to maintain his suit, than merely to establish that the securities were held as collateral, for, as I have already said, the

holding as collateral was not inconsistent with having the power to sell; the vital point was, to show that this power, so absolute in terms, had been restricted in fact, in order to bring the case within the ruling above cited, and to sustain the charge of a fraudulent conversion; for, as the case stands at this stage of the examination, the defendant held the scrip as collateral, but with the full, absolute, and unrestricted right to sell, or convey, or convert, at his pleasure, and to the best of his judgment, being answerable only for the surplus of the proceeds after reimbursing himself, and for his diligence and good faith in the performance of his trust.

The court below may have regarded the parol testimony alone as sufficient to establish the fact, that the defendant received the scrip and requisitions as collateral security, and to justify the conclusion as a conclusion of law, that being so received, the defendant had not legal authority to sell without demand of payment and notice.   Such would be a correct conclusion in case of a strict pledge, where no power to sell had been given, or where it was restricted; but it would be neither safe nor sound where an express and unrestricted power had been given by an absolute transfer.   I have not attempted to consider the question of the admissibility of the parol testimony to give effect to the supposed intention of the parties to the contract, for the reason that I attach no importance to it; it simply establishes, if it establishes anything, what the defendant fully concedes.

I have carefully examined the other authorities cited by the respondent, viz., Coddington v. Bay, 20 Johns. 640; Chitty on Bills; Bristol v. Sprague, 8 Wendell, 424; Wardwell and others v. Howell, 9 Wend. 170; Stulken v. M'Donald and others, 6 Hill, 93; Brissel v. Drake, 19 Johns. 66; Jenners v. Bean, 10 New Hamp. R. 264; Williams v. Little, 11 New Hamp. 71; Presdt. Wash. Bk. v. Lewis, &c., 22 Pick. J. 24.   The majority of these cases are to the effect, "that to protect the holder of a negotiable security, which has been improperly transferred to him in fraud of the prior legal or equitable rights of others, it is not sufficient that it has been received by him merely as a security, or nominally in payment of a pre-existing debt, where he has parted with nothing of value, nor relinquished any security

upon the faith of the paper thus improperly transferred to him, without any fault on his part." These cases all follow the rule laid down in Coddington *v.* Bay, which is regarded as the leading case, and in which the English authorities upon the point in controversy are fully considered. In most of the cases, the notes in question were strictly pledged as collateral security. I cannot see for what purpose they are quoted. In none of them was the point decided as to whether the pledging of the collateral security gave the right to sell; and none of them consider the character of a pledge, further than to say, as in Jenners *v.* Bean, "that where a negotiable promissory note is endorsed in pledge as a collateral security for a debt due from the endorser to the endorsee, the endorsee takes it like a chose in action, *not negotiable,* subject to all defences to which it would be subject in the hands of the endorser at the time when notice is given of the endorsement."

This doctrine is a familiar one, and however correct, can have no bearing here, unless it is to show that a note endorsed over as a collateral security, is a pledge, that the reporter calls it a pledge, the counsel calls it a pledge, and the court calls it a pledge; but all that don't make it a pledge; and if it were a pledge, the *right of sale* is not raised or questioned. These authorities are not even serviceable to show that parol testimony may be introduced to prove, as between the parties endorser and endorsee, that a promissory note is held as collateral. In those cases, the defence went to the *want of consideration,* and parol testimony was admitted, to show the want of valuable consideration set up in defence; and the rule is, that where a note is thus passed to secure a pre-existing debt, it is taken by the endorsee, subject to all defences.

The case of Hays & St. John *v.* Riddle, 6 Sandford, S. C. p. 249, was an action in trover for the conversion of a bond payable to bearer. The bond in suit, with two others, was left to secure an advance of $23,000 due from the defendant to plaintiffs. The defendant received the bond from the plaintiffs *for the purpose of getting it exchanged* for Erie Railroad Stock. He was to bring the stock back *as a substituted security.* It was held, that where the pledger of a bond delivers it to the

pledgee *for a particular purpose*, as to be exchanged for stock, and to return the latter, and the pledgee *converts the bond to his own use*, the pledger may maintain trover for the bond. Surely there is no kind of analogy between that case and this; besides, the only point decided was, that the plaintiff could maintain his action without making a demand.

None of these last-cited authorities, therefore, throw any light upon the particular point in issue here, which is as to the authority of the defendant to sell. And for additional light upon this subject, I now turn to the drafts drawn by Hyatt, Cox & Sheldon, on the defendant, and cashed by him. A careful and deliberate examination of the language of these drafts has fully satisfied my mind that they contemplated the selling, and recognized the right of selling in the defendant, of the securities placed in his hands. What other construction shall be placed upon it? What other sense or meaning can be fairly attributed to the words employed? What did Hyatt, Cox & Sheldon intend to convey to the mind of the defendant, when they directed him to pay their drafts " when in funds from the proceeds of the securities placed in your hands?" And how was the defendant to be in *funds* from the *proceeds* of the securities, unless from sale of them?

These drafts were the contemporaneous papers in the transaction which qualified and explained the transfer of the securities, and they should be taken and construed together, according to the rule laid down in Wilson *v.* Little, and upon a fair construction of the language of the drafts, and the transfers, taken together, construing the words employed in the drafts according to their legal signification, and their plain, sensible, and practical import, it is impossible for me to arrive at any other conclusion, than that authority was given to the defendant to sell, and convert the securities into cash. Taking the drafts, or the transfers and assignments, together, and there is no longer any doubt, mystery, or obscurity in this case. The intention of the parties is made transparent; the authority of the defendant to sell is rendered perfectly clear and unclouded; and the reason why the plaintiff did not dissent to, or question, the correctness of the defendant's books in which the proceeds of the sales of the secu-

rities were carried to his credit, and which accounts and books he frequently inspected, is made manifest.

The reason and justice of this case seem to me, also, to be in harmony with this view, and I cannot but yield my concurrence and assent to the opinion and conclusion of my learned associate, to the effect, " that an express stipulation in writing could not exhibit more clearly the authority of the defendant to sell the securities, than does the language of these drafts."