## HUGH DAVIS *v.* MISSISSIPPI CENTRAL RAILROAD COMPANY.

PAYMENT — RECEIPT OF CONFEDERATE MONEY — DURESS. — One who received from his debtor payment in Confederate money, in October, 1862, at Holly Springs, upon a tender by the debtor, who, when plaintiff objected to receiving it, told him "he must" take it, but did not use any force, or threats of force, or reference to compulsion of any sort, cannot treat such payment as invalid, and recover on his original demand, by showing that, at the time of the receipt of the Confederate money, a portion of the Confederate army was in Holly Springs, and that military orders required the acceptance of Confederate money in payment of debts, and that the provost·marshal at Holly Springs was charged with the duty of arresting persons for refusal to accept this currency, and that some persons had been arrested for it: *Held,* Such circumstances do not constitute duress.

ERROR to the circuit court of Marshall county. DAVIS, J.

*Walter & Scruggs,* for plaintiff in error,

Submit that the first verdict in this cause, which is for the plaintiff in error, must stand, and that the court below erred in setting it aside. The question upon which the verdict of the jury was found was simply a question of fact, all the law involved in the case was fully explained in the charges given by the court below. The question which the jury had to determine was, whether in receiving the money plaintiff in error acted under duress or not. "Every contract," says Bacon, "must be the act of the understanding, which they are incapable of using, who are under restraint and terror, and therefore the law requires free consent as essential to every contract." 2 Bac. Abr. 402, title Duress; Brown v. Peck & Wood, 2 Wis. 277.

Consent is the essence of every contract, and where there is compulsion there is no consent. 1 Pars. on Cont. 319, 320; 2 Metc. (Ky.) 447; Burk v. Burton, admr., etc., 18 Ark. 233.

The law as to definition of duress, given by the charges of the court below on the first trial, was more favorable to the railroad company than those as above cited, and the jury having the fact to determine whether or not there was duress found for the plaintiff, the testimony not only warranted but

justified the verdict. The testimony of the plaintiff is, that he had been a large creditor of the railroad company, had indulged it in money matters to a great extent, that whenever he asked for money they were always pressed, that in January, 1862, he urged the company for a settlement, and it paid him in cash $2,000 in Confederate money, and executed their note for the balance, which note is sued on in this action; that in the latter part of October, 1862, he was in Holly Springs, where the headquarters of the company then was; was called into the office of the company where its president, secretary and treasurer were; that Mr. Mason, the treasurer, said the company desired to pay him what it owed him; that he objected to receiving the money, and assigned various good and substantial reasons why he did not wish to receive it; to all of which objections the reply was, you must receive it; he told them that his home was within a few miles of the federal lines, that the probability was that in a very short time the federal army would reach and take possession of his home; that he could not use the Confederate money, and that the company could; all the reasons which would likely induce a man of ordinary foresight and prudence to decline it were assigned by him; the federal forces did take possession of his home within four days after that and controlled his actions and movements. At that time the headquarters of the Confederate army under Gen. Van Dorn was at Holly Springs, a military order was in existence for the arrest of any person who refused to take Confederate money in payment of debts, or attempted in any way to depreciate its value. Captain William H. Jones, the provost marshal, had his office in Holly Springs at the time, with instructions to arrest any one who infracted said military order, and actually did arrest and imprison certain persons for said infraction.

This, then, was the condition of things in North Mississippi. A refusal to take the money a violation of a military order; the military officers on the ground, ready to inflict severe punishment on any one who violated said order; the

conduct and language of the railroad officers, you must take the money ; the reasons assigned by Davis why he did not wish to receive it; all force the irresistible conclusion that he did not act with his own free will, and that he was under duress when he did receive it. The jury so found, and the court below had no right to disturb their verdict. The defendant in error insists that, if Davis was under duress at the time that he received the money, his long acquiescence ratified the act. The proof is that, shortly after the transaction, a few days, the federal forces were at Davis' house, had possession and control of him and his house, governed his every movement; the office of the railroad company moved from Holly Springs further south; that he never saw any of the officers of the company until 1865, when he complained of their treatment toward him in compelling him to take the money; that the headquarters of the railroad company were all the time within the Confederate lines ; and, even if he could have reached them, the same duress which compelled him to receive the money would have prevented him from tendering it back. This was a fact, however, which the jury passed on, and their verdict must stand. "It is the peculiar province of the jury to weigh the evidence, and give credit to those facts which, in their judgment, are entitled to the greater consideration. The law has wisely imposed this delicate duty upon jurors, and it is not for the court to rejudge their judgment." Kelly et al. v. Miller et ux., 40 Miss. ; Starks v. Miller & Adams, 36 ib. 434. "A judgment will not be satisfied as against evidence, merely because, in the opinion of the court, the evidence preponderates greatly against the verdict." Johnson v. Hamburger, 15 Wis. 175 ; 15 Iowa, 72 ; 12 Ohio, 146 ; Ohio & C. R. R. Co. v. Brown, 25 Ill. 124 ; 10 Iowa, 440 ; 11 ib. 285 ; Williams v. Baker, 49 Me. 427.

We submit that on the second trial the court below erred in excluding from the jury the testimony of Davis, that he would not have received the Confederate money but for the

existence of the military order.   The fourth charge given on this trial on the part of the railroad company is as follows : " To constitute duress the danger must not only exist in the opinion of the person menaced, but it must be shown to have actually operated upon the mind and to have constituted the motive for the performance of the act sought to be avoided."   How are we to know the motive of the plaintiff, except by his declarations ?   The charge we submit is correct, the refusal to admit the testimony is error.

The court also erred in refusing to admit that portion of Judge Orr's testimony from the jury.   Orr, at that time, was the Confederate military officer in command at Holly Springs, and his testimony shows the condition of affairs there then, their absolute authority, their entire readiness to arrest, imprison or do any other tyrranical act which they saw proper.   It certainly was competent to show the condition of the company and the liability, if not the certainty, of the arrest of any one violating military orders.

*Watson & Manning*, for defendant in error.

Was the plaintiff placed under duress by the circumstances under which he received the Confederate money as a payment of his debt ?   What is duress ?   Coke says that for "menaces in four instances a man may avoid his own act : 1st. For.fear of loss of life ; 2d. Of loss of member ; 3d. Of mayhem ; 4th. Of imprisonment." 2 Bac. Abr. 403, title Duress.   Nor it does not appear that, for refusing to take Confederate money, any one had ever been subjected to the loss of life or member, or to mayhem ; or had ever been threatened with either.   If duress existed in the case, it was from the fear of imprisonment by the plaintiff, and for any such fear no sufficient grounds existed, or were in proof, before the jury.   Greenleaf says : "By duress, in its more extended sense, is meant that degree of severity, either threatened and impending or actually inflicted, which is sufficient to overcome the mind and will of a person of ordinary firmness." 2 Greenl. on Ev., § 301.   This defini-

tion is adopted by the supreme court of the United States, in the case of Brown v. Pierce, 7 Wall. 214.

In this case the plaintiff relied upon duress of imprisonment; or rather, upon the fear of imprisonment, not actual imprisonment, and the practical question is, was the plaintiff, in accepting the money, influenced by threats of any kind whatever; or was he really placed in circumstances which did inspire a just fear of any restraint of, or injury to, his person. We submit that the case is lacking in one necessary ingredient of duress, there was neither imprisonment nor harm, nor threatened imprisonment or harm.

The subject of duress is well discussed in the cases of Jones v. Thomas, 5 Cold. (Tenn.) 445; Belote v. Henderson, ib. 471; Waller v. Parker, ib. 476, and in Rollings v. Cate, 1 Heiskell, 98. In the second of these cases the court say: "Duress of the person may be actual violence upon the person, or threats of personal violence, or actual arrest or imprisonment, without lawful authority, or threats of unlawful arrest or imprisonment." 5 Cold. 474.

Now it is submitted that the testimony in this case does not bring it within the foregoing accurate definition of duress of the person.

In the case of Wilkerson v. Bishop et al., decided by the supreme court of Tennessee, the court say, "Because it is shown that it is dangerous to refuse a particular kind of currency, it does not follow that every man who receives it is impelled by fear of danger. When threats, or other attempts at intimidation are proven, then the fact of the danger to which the party disregarding the threat is exposed, is a fact, which, proven in connection with the threat, may complete the duress. But the mere proof of the existence of the danger, without proof that it in fact operated upon the mind of the party, or that such threats or other means were employed as must tend to cause it to operate upon the mind, will not be sufficient to establish the fact of duress. If it were otherwise, every contract, the consideration of which was Confederate money, entered into during the reign

of terror spoken of by the witness in this case, might be set aside. To constitute duress, the danger must not only exist, but must be shown to have actually operated upon the mind, and to have constituted the controlling motive for the performance of the act sought to be avoided."

Now the plaintiff himself being the judge, he did not receive the payment in question under duress. He does not pretend that he was threatened with injury of any kind, had he refused to take the money. His language is, that he objected, saying, "that he owed a debt, which he was afraid he could not pay off with the money, if he took it." Now the fear that the money might not be available to him, in the payment of a particular debt, certainly did not constitute a duress. The proof is, that at the time Confederate money was the only currency in general circulation in the state, and that it was valuable, and purchased whatever was for sale. Moreover, if it was so dangerous for the plaintiff to refuse to take this currency, why did he not anticipate that under the same terror his creditor would not refuse to take it. His creditor was Maj. Gorman, his neighbor, as we are informed by plaintiff himself on his examination by way of rebuttal, and by defendant's witness, Mason. The proof is distinct that no threats were used to influence the plaintiff, and that he did not say that he was afraid of being arrested if he refused the money, and that nothing was said about the military order compelling persons to take Confederate money.

Plaintiff says that he also assigned as another reason why he did not wish to take Confederate money, that he thought it unsafe to have so large an amount on hand at his residence. He objected farther that he did not have the note with him, and therefore could not settle, and he then adds: "but I was assured that a receipt against the note would be sufficient. At this time the Confederate army was near Holly Springs, with headquarters in the city. Mr. Mason then counted the money to me, for which I executed my receipt." The money then was accepted by the plaintiff

and for it he executed his receipt, and he then adds, " a few days after receiving said money, I offered it to Maj. Gorman, in payment of a debt I owed him, but he refused to take it." Here then is a refusal by a citizen to receive Confederate money, and no harm followed ; and this .very refusal was even anticipated when plaintiff received it. Fort and Crump also prove that .they refused to take Confederate money, and that for so doing they were never molested.

The attention of the court is especially requested to the case of Jones v. Thomas, 5 Cold. 545. In this case it is held that " causes which would be allowed to invalidate and annul payments and settlements in Confederate money, must be nearly or quite the same as those which will vitiate payments and settlements not tainted with that currency, as mistake, fraud, duress, and the like."

Now this is the language of a court that held that Confederate money was an illegal currency that would not support an unexecuted contract. This court has properly, always held Confederate money to have been a legal currency, and has uniformly upheld unexecuted contracts, supported only by that currency, and therefore the foregoing language from the supreme court of Tennessee will be applied with additional stringency by this court to a contract executed in this state as the contested payment in this case was. It should be remembered in this connection too, that the decisions of this court upon this subject have been fully indorsed by the supreme court of the United States. Thorington v. Smith, 8 Wall. 1.

The most that can be said in this case is, that the plaintiff was unwilling to receive payment of his debt in Confederate money; but this unwillingness falls far short of legal duress. Thousands of instances have occurred in which creditors unwillingly received payment of debts in Confederate money, and will it be contended that on this ground alone such payments are to be held for naught ; and so, too, many creditors who, on debts contracted before the war,

had a right to demand specie, have unwillingly accepted of currency in payment. Are these transactions also to be invalidated? or will they not be held to be executed, and firmly obligatory?

In the language of the Tennessee court, in the case of Jones v. Thomas, "the public good demands now, as in the ordinary conditions of life it has always done, the discouragement of litigation, the prevention of strifes and animosity, and the protection and maintenance of the peace, repose and harmony of the people." 5 Cold. 467.

Upon this principle, therefore, if upon no other, this court should hold the plaintiff bound by his acceptance of Confederate money as a payment of the debt for which he is now suing. Even in Tennessee, where Confederate money has been looked upon with so much disfavor, the supreme court holds that "mere unwillingness to receive Confederate currency, in payment and settlement of debts, will not, if the currency be actually received in payment and settlement, be enough to invalidate the acceptance as a payment." Jones v. Thomas, 5 Cold. 465.

In the case of Cross, guardian, v. Sells et al., recently decided by the supreme court of Tennessee, it was insisted by the plaintiff that a payment in Confederate money, not indorsed upon the note, was an unexecuted contract, and the currency being illegal would not be sustained. The court, however, held that "to entitle the debtor to a credit for the amount paid, the actual entry of the payment on the note is not necessary, he may prove such payment *aliunde*."

" It is only necessary that he show, by competent testimony, that he paid and his creditor received the Confederate money upon the understanding, expressed or implied from the circumstances connected with the payment, that it was to be a payment on the note or other indebtedness of payor to the payee."

The plaintiff, on his cross-examination, says: "Nothing was said by Goodman, McConnico, Mason or myself,

about the military order requiring persons to receive Confederate money at the time that I received said money, and no threats were used to induce me to take it. Nor did I, at the time, object to receiving said money because it was Confederate money." He says, too, "nor did I ever tender the money back to the railroad company."

Mason proves that "the best feelings existed between plaintiff and the officers of the company."

2d. The testimony not only disproves duress when the payment was received, but, had it even existed, the plaintiff afterward so ratified it as to give it validity.

The payment was received the last of October, 1862. At that time and, subsequently, Confederate money was the almost exclusive currency.

TARBELL, J. :

The plaintiff in error holding the note of defendants in error and having also against them an open account, received payment thereof in October, 1862, in Confederate money. In 1868 Davis sued the company to recover the amount of the note and account. Upon the trial the question was, whether the facts and circumstances attending the said payment constituted a duress of Davis, by which such payment was void or voidable ; and, conceding that Davis accepted such payment against his will and because of duress, whether he had not, nevertheless, subsequently ratified it. There were two jury trials. The first resulted in favor of plaintiff for $5,600 ; the second verdict was for defendants. The first was set aside on motion of defendants. To this the plaintiff objected, and the granting of that motion is assigned here for error. Upon the rendition of the second verdict, the plaintiff applied for a new trial, but his motion therefor was overruled, and this is also assigned for error. Several instructions were given by the court to the jury for the respective parties, one of the series asked for defendants on the first trial being refused. On the second trial, twelve instructions were given for the plaintiff, none being refused

for him on either trial, and these were given on the second trial: nine charges for defendants, one, the 10th, being refused. The giving of the 2d, 4th, 5th, 6th and 9th charges for defendants is assigned for error. Davis offered to testify on the second trial, that he would not have taken Confederate money but for military orders. This testimony the court excluded, and this is assigned for further cause of error. A portion of the testimony of Judge Orr was also excluded, and this constitutes another allegation of error.

The facts attending the payment are these : Davis had for twenty years been a contractor of the Mississippi Central Railroad Company ; being in the office of the company on the 21st day of October, 1862, to get an account allowed, payment of the note and account sued on was tendered by the officers of the company ; the note is dated May 24, 1862, for $5,000, with interest at ten per cent per annum ; the open account is for labor, wood, lumber, etc., amounting to $5,707 92 ; the tender and payment was on October 21, 1862. The plaintiff, testifying as a witness in the cause, says, "I was called into the railroad office, where the president, Mr. Goodman, the secretary, Mr. McConnico, and the treasurer, Mr. Mason, were ; I was informed that they desired to pay all they owed me ; I was unwilling to receive it and objected to its payment ; Goodman or some other officer present, said I must receive it ; that the road was unwilling longer to pay interest on the debt ; I still objected ; said I owed a debt which I was afraid I could not pay with the money ; that I was living near the lines of the federal troops ; that they were reported moving southward and it was unsafe to have so much money at my house ; that the railroad office was going south and they could better take care of it, and I preferred the debt to remain as it was. To all this they replied I must take it. I said I did not have the note with me and therefore could not settle, but was assured a receipt would be sufficient. * * * I took the money and executed receipts in full of the note and account. * * * Nothing was said about the military order when the money was

paid and no threats were made. Did not state at the time that I objected to receive the money because it was Confederate money."

Mr. Mason, the treasurer of the company, testified that the plaintiff was a large contractor with the company; that he was very indulgent and kind to the company, and that the very best feelings existed between the officers of the company and plaintiff. When the payment was made plaintiff objected to receiving it, stating, as one reason, that he was fearful his creditor, Gorman, would not take it from him in payment of a debt he owed him. No threats were used, or reference to military orders. On the second trial, this witness added to the foregoing, that, at the time of payment, plaintiff said it was hard to force him to take Confederate money, when he had waited so long on the company.

The foregoing embraces all the testimony relating to the immediate transaction of payment, and the conversation on that occasion. As to external surroundings, proof was made of the condition of the country; the presence of a portion of the Confederate army at Holly Springs; the existence of a military order forbidding the depreciation of Confederate currency, and requiring it to be received in payment of debts, under penalty of arrest, trial and punishment by military tribunals; the arrest of some parties for declining to receive this money, and the disregard of the refusal of others to accept it; the approach of Grant's army; the value of Confederate money in 1862–3; the transactions of the plaintiff, in Confederate money, for himself and for his neighbors; the situation of plaintiff with reference to Grant's army, etc. Proof was also made of the conversion, into Confederate bonds, of the money paid by defendants to plaintiff, and of. the efforts of the latter to induce the former to compromise this claim after the war and before suit.

The testimony bearing upon the question of duress, as affected by the military orders, and other external circumstances, was this: The plaintiff testified that, at the time of

the payment, the Confederate army, under Price or Van Dorn, was at Holly Springs, and at this time an order of the Confederate military authorities was in existence, requiring all persons to receive Confederate money in payment of debts, and provided that all persons who refused to take it, as aforesaid, should be arrested by the provost marshal, and dealt with by said military authorities. On the second trial, in addition to the foregoing, Davis testified that he knew of the military order, and that, in the summer of 1862, several citizens of Henderson county, near his residence, were arrested and confined for violating it ; that he lives one mile south of the line of Henderson county. William Crump testified that he refused to receive Confederate money in June, 1862, and was not disturbed for it. William Mills testified that, in the summer of 1862, he offered to pay a citizen Confederate money, which he refused until threatened with arrest. William H. Jones testified that he was provost marshal at Holly Springs in 1862, until November of that year, and that he arrested one man for refusing to receive Confederate money. Judge Orr testified that he was in command of the Confederate forces at Holly Springs, with ample authority to arrest suspicious persons ; that in some instances military force was applied to compel citizens to accept Confederate treasury notes as money, and arrests were made by Confederate officers under orders of Generals Van Dorn and Bragg. Of the arrest and release of one Hawkins under this military order, Davis knew nothing. Mr. Strickland testified to the disbursement of large sums of Confederate money in the subsistence department of the Confederate army between Grenada and the Tennessee line ; he forced no one to take it, and knew of no one having been forced to take it. Captain Clarke testified, that he was with the army of Van Dorn, as commissary, at Holly Springs ; disbursed large amounts of Confederate money for supplies, and no one refused to receive it from him.

It appears that the plaintiff was for many years a large contractor for the railroad, working at times as many as

thirty or forty hands; that he was on the most friendly terms with the company. Notwithstanding the payment in 1862, of which he now complains, he applied to the company for work after the war; and we understand the complainant to intimate that he was regarded as "a very great rebel." Very much of the testimony is devoted to the value of Confederate money at different periods, and in various localities, as affected by the presence or absence of the federal or Confederate troops. Much of it, also, goes to show the hardship of the particular transaction upon the plaintiff. The excluded testimony of Judge Orr related to his military power in theoretical cases. All this we think foreign to the main fact to be established to entitle the plaintiff to recover. However much we may sympathize with the plaintiff in his loss in this case, we are not at liberty to dispose of the case upon such grounds. We may observe upon this point, however, that the history of this state will show that during the years 1862, 1863 and 1864, if not early in 1865, lands, in portions of Mississippi, were readily purchased with Confederate money. In fact, the evidence shows that in 1862 and 1863, Confederate money was freely and generally received in North Mississippi for property of all kinds, except in the immediate presence of the federal troops.

These facts, however, are immaterial, for the question to be solved is, whether, when the payment by the defendant to plaintiff was made, the latter was under duress. The burden of proof was upon the plaintiff. He was dealing with those with whom he had been on the most friendly relations and with whom he had been a large contractor for twenty years; they were probably also politically in sympathy; no threats were made; the question was not even asked as between old friends, if they meant to force him to accept Confederate money; even the military order was not referred to by plaintiff as an existing fact, which would prevent his refusal to comply; he did not even ask the meaning of the use of the word "must" by the officers of

the company; even after the war, when he complained of the hardship of paying him in Confederate money, which he still held, he did not aver that he would not have taken Confederate currency but for the military order; only upon the second trial does the plaintiff testify or offer to testify, that, in the absence of the said order, he would not have accepted the currency paid him by defendants; he did not at any time intimate fear to refuse the payment as made; his own creditor, Gorman, did not hesitate to refuse the same money; whether the plaintiff attempted to employ the military order to compel Mr. Gorman to accept the money does not appear; he was at liberty to appeal to it if it possessed any virtue as a compulsory process; but he assigned to the officers of the railroad company, as a reason for objecting to Confederate money, the probable refusal of his creditor to receive it; and no intimation or suggestion of compulsion upon him was thrown out; no test was created or proposed by plaintiff to ascertain the meaning of the officers of the railroad company in their use of the word "must," or of their action or the probabilities of his arrest in case of his refusal to comply with their wishes; the plaintiff was confessedly a great rebel; he apparently operated largely in Confederate currency, taking to Aberdeen at one time, to fund for his neighbors, $75,000 of that money; being within the federal lines he was ordered to remain therein, but, in violation of this order, he left the federal jurisdiction, coming within the Confederate lines and going to Aberdeen to bond his Confederate money, showing that he then sustained and approved of a policy of which he now complains as affording just cause for avoiding his contracts.

A minute examination shows the case to be wholly wanting in proof of force or threats of force to induce the plaintiff to accept the payment made him by the officers of the railroad company, and not only so, but the idea of compulsion is negatived by the parties to the transaction. The reasons given by the plaintiff at the time of payment for objecting

thereto were these: that he was afraid his creditor would not receive the money; that he was living near the lines of federal troops, and it was unsafe to have so much money in his house; the office of the railroad company was going south and they could better take care of it. The reasons assigned by the officers of the company for the payment was the unwillingness of the railroad company to pay interest longer. The plaintiff retained the money paid him until the winter of 1863–4, when he went to Aberdeen to invest it in cotton, but concluded to bond it. He did not then seek the officers of the railroad company with a view to return the money, but after the war he called on the defendants for work and then complained only of the hardship of losing the money.

Thus the proof of force or threats of force is not only wanting but disproved, for we must accept the explanations of these parties of the motives of their conduct as they have given them, and we cannot assume that they were actuated by motives directly the reverse of those which they have given under oath. Only by indulging in the wildest imagination, by ascribing to the parties feelings and purposes the converse of those declared, by conceiving in proof an unbridled soldiery and unprincipled officers, impelled by improbable resentments, not susceptible of demonstration by testimony because only problematical at best, can we make out a case for the plaintiff. Accepting the testimony of the parties as the truth, and construing their language according to its ordinary use, the essential facts constituting duress are wanting. In a word, the plaintiff failed to make out his case. Conceding all the plaintiff proved and all he proposed to prove, which was excluded, and still a verdict for him would be contrary to the law and evidence. Hence, the court did not err in setting aside the first verdict herein, and with our views we need not discuss the rulings and the instructions given and refused on the trial. Neither is it necessary to lay down any rule on the subject of duress. With a slight modification of, or addition by, the Ameri-

can authorities, to the fourth "instance" stated by Coke, the elements of duress have remained unchanged from that time to the present. This branch of the law is fairly discussed by the courts of Tennessee, to whose decisions we are referred by counsel. Greenleaf states the modern rule clearly and succinctly. Greenl. Ev., title Duress. United States v. Keehler, 9 Wall., is conclusive of the case at bar. As in that case, so in this, force, actual, present, menacing and impending, susceptible of demonstration and proof, or threats of force, are wanting. Keehler, a resident of the Confederate States, had money belonging to the United States. In obedience to an order by the Confederate authorities, and a law of the Confederate congress, he paid the money upon the above order. The supreme court of the United States held him without justification, in the absence of force, actual, impending, menacing and threatening. We know of no case wherein the plea of duress has been sustained unaccompanied with force or threats of force. Without force, actual or threatened, with a reasonable ground of apprehension, there can be no duress. Such is the uniform doctrine. Tompk. Law Dict. ; Bouv. Law Dict ; Burrill's Law Dict ; Chitty on Cont. ; Black. Com. ; Kent ; Bacon's Abr ; Greenl. Ev. ; Stark. Ev., title Duress ; 3 N. H. 508 ; 8 ib. 386 ; 6 Mass. 506 ; 13 Me. 146 ; 17 ib. 338 ; 5 Hill, 154 ; 1 ib. 343 ; 2 Kern. 99 ; 2 Comst. 82 ; 26 N. Y. 9 ; 7 Wall. 214 ; 9 ib. 83 ; Van Der Hoven v. Nette, 32 Texas, 183.

Blackstone says : "Duress is of two sorts : duress of imprisonment, where a man actually loses his liberty ; and duress *per minas,* where the hardship is only threatened and impending." "Duress *per minas,*" says this learned commentator, "is either for fear of loss of life, or else for fear of mayhem, or loss of limb. And this fear," he says, "must be upon sufficient reason." In continuation of the subject, he adds : "And the law so much discourages unlawful confinement, that if a man is under duress of imprisonment, which we before explained to mean a compulsion by

an illegal restraint of liberty, until he seals a bond or the like, he may allege this duress and avoid the extorted bond. But if a man be lawfully imprisoned, and, either to procure his discharge, or on any other fair account, seals a bond or a deed, this is not by duress of imprisonment, and he is not at liberty to avoid it.''

''By duress, in its more extended sense,'' says Greenleaf, ''is meant that degree of severity, either threatened and impending, or actually inflicted, which is sufficient to overcome the mind and will of a person of ordinary firmness.'' In Robinson v. Gould, 11 Cush. 57, the supreme judicial court of Massachusetts say, that ''duress by menaces, which is deemed sufficient to avoid contracts, includes a threat of imprisonment, including a reasonable fear of loss of liberty,'' and this case indicates, probably, the extent of the modification of the common-law rule on this subject by the American authorities.

An arrest, though for a just cause, and under lawful authority, yet, if it be for an unlawful purpose, is duress of imprisonment (8 N. H. 386), and a bond given for maintenance, as required by law, is void for duress, if the warrant and other proceedings are not according to statute. 17 Pick. 252. Where there is an arrest for improper purposes without just cause; or an arrest for a just cause but without lawful authority; or an arrest for a just cause, and under lawful authority, for an improper purpose, and the person arrested pays money for his enlargement, he may be considered as having paid the money by duress of imprisonment, and may recover it back in an action for money had and received. 3 N. H. 508. In 13 Me. (1 Shepl.) 146, it was held, that if a person act freely and voluntarily, although under unlawful detention, the obligation is valid. One ground of defense in United States v. Keehler, *supra*, was, that throughout the year 1862, the Confederate government had force sufficient to enforce its orders, and did enforce them in that part of North Carolina where the defendant resided, and that no protection was offered to the citizens

of that part of the state, by the United States government, during that period. In regard to this defense, the court say : "It will be observed that this statement falls far short of showing the application of any physical force to compel the defendant to pay the money to Clements,    *    *    * nor does it prove that he would have suffered any incon- venience, or been punished by the Confederate authorities, if he had refused to pay the draft of the insurrectionary post-office department on him. We cannot see that it makes out any such loss of the money, by inevitable overpowering force, as could, even on the mere principle of bailment, dis- charge a bailee. We cannot concede that a man, who, as a citizen, owes allegiance to the United States, and, as an officer of the government, holds its money, as property, is at liberty to turn over the latter to an insurrectionary govern- ment, which only demands it by ordinances and drafts drawn on the bailee, but which exercises no force or threat of per- sonal violence to himself or property in the enforcement of his illegal orders. See, also, Brown v. Pierce, 7 Wall. 205, and numerous cases therein cited. *Vide*, also, 3 Cal. 166 ; 2 Wend. 243 ; 15 Johns. 256 ; 2 Edw. 601 ; 26 Barb. 122.

We do not make these references and quotations for the purpose of criticism, or to enunciate any rule, but mainly to illustrate the defect in the plaintiff's case. His arrest upon a refusal of Confederate money was not a certainty. A few only had been arrested for such cause. No other injury to such, than arrest, is shown. Whether any suffered beyond temporary arrest does not appear. Violence is not preten- ded in any case. Many refused Confederate currency with perfect impunity, as plaintiff might have done. Construing the evidence most favorable to plaintiff his arrest was an uncertainty, speculative and problematical only. To sus- tain the plea of the plaintiff would engraft a modification upon the doctrine of duress, unsound in principle and dangerous in policy. It would do more ; it would virtually declare the citizens of North Mississippi and the soldiers and officers in that locality in 1862 to have been actuated by

a demoniacal spirit, which we are unwilling to believe. To hold that there can be duress without menace or threat, would be like finding fraud without misrepresentation. The fear of arrest or injury must be well grounded. If, in the case at bar, the fear of the plaintiff was reasonable, without force impending or threatened, the cause for such fear does not appear in the record. To determine that there was duress of plaintiff in this case, we must give to the testimony a meaning directly contrary to the usual import of the words employed; or must also determine that a public sentiment existed among the people and on the part of the soldiery which only a Bunyan or a Milton might attempt to portray. In short, as in United States v. Keehler, the facts "fall far short" of constituting duress. In this era courts of justice do not uphold claims unsupported by evidence. The law favors diligence and in times requiring prudence and courage a party cannot fold his hands and shut his eyes, and, when despoiled, appeal to the courts to relieve him from his own indolence. The plaintiff when tendered payment ought to have tested the motives of the defendants by declining the money until arrested in fact, or, at least, until threatened with the perils of the military order. With our view of the case another trial would be useless, nor is it necessary to advert to the questions presented by the exclusion of testimony, or by the giving or refusing instructions. The case on the part of the plaintiff is not and, we judge from the record, cannot be made out.

*Judgment affirmed.*