Bouldin, J.
delivered the opinion of the court:
In the year 1859, James Wall, then of Montgomery' county, Ya., being about to remove to the State of Missouri, placed in the hands of his friend and neighbor, John Hale, of the same county, for collection when they should' become due, two bonds of one John B. Slusher, dated April 6th, 1859, for $1,302 each; one payable the 10th of April 1861, and the other the 10th of April 1862. These bonds were given by Slusher to Wall for the purchase money in part, of a tract of land in said county, sold by Wall to Slusher, and a lien was retained on the face of the deed to secure their payment. The fact, *427 however, of the lien being retained, did not appear on the face of the bonds, nor does it anywhere appear, that it was ever communicated to Hale or was known by him. Soon after the bonds had been placed iu the hands of Hale, Wall left the State of Virginia for the State of Missouri, where he has ever since resided.
In October 1860, at the solicitation of Wall, J. B. Blusher paid him in advance, the sum of $500, for which Wall agreed to allow him a premium of 12J per cent.; and by his instructions a credit of $538.58, payment and premium, was endorsed by Hale on the bond first falling due, as of the 10th of April 1861, being the maturity thereof. This paymeut was made by deposit in the Branch of the Farmers5 Bank of Virginia, at Blacks-burg. Ho other payment was made until about the last of February or first of March 1862, when the sum of $811, being the balance then due on the first bond, was tendered and paid by Blusher to Hale in notes of solvent banks, the most of it in Virginia State bank notes. Prior to this time Hale had written to Wall, asking for definite instructions as to the mode of transmitting his money, when collected, but had received no reply, nor did he at any time thereafter, receive any instructions from him. Wishing to place the money in some secure place he deposited the entire amount collected, $811, to his own credit in the Bank of the Valley at Christians-burg, on the 28th of March 1862, and took from the teller a certificate of the deposit.
The other bond fell due on the 10th of April 1862 ; anrlon the 3d of May thereafter, the full amount thereof, principal and interest, being the sum of $1,307.24, was also paid by said Blusher to Hale—about $520 of it in Confederate States treasury notes, and the residue in the notes of solvent banks—chiefly notes of Virginia banks. On the same day—the 3d of May 1862—Hale deposited the notes thus received, $1,307.24, on special deposit in the Branch of the Farmers’ Bank at Blacksburg, taking *428 from the cashier a certificate thereof. This deposit was to be returned to Hale or his order on return of the certificate. Both of these certificates were carefully preserved by Hale for Wall, until the close of the "war between the United States and the Confederate States of America.
At the dates of the collections, it is well known to us as a matter of history, that the notes of the banks of Virginia and of other solvent banks, and Confederate States treasury notes were but little depreciated, not more perhaps, than the paper currency of the United States, if so much ; that they then-constituted the only currency in Virginia, and were universally paid out and received by the banks of the State, and by prudent men of business, in all their transactions.
Both of the banks in which Wall’s funds were deposited, seem to have failed, and the deposits have thus been lost.
Hale is a plain man of but little culture, and, as charged by Wall in his bill, of weak and feeble intellect; and he acted in this matter wholly without compensation, merely to accommodate his friend and neighbor, Wall. He has not derived, and never expected to derive, the smallest personal advantage from the transactions.
After the close of the war, to-wit: in October 1865, Wall came to Virginia to look after his money, and Hale then tendered him the two certificates which he had taken and preserved as aforesaid, but Wall declined to receive them ; and in January 1866, instituted his suit in the Circuit court of Montgomery "county on the chancery side thereof, against Hale and Slasher, seeking to hold them responsible for the debt. The bill, after alleging that the bonds had merely been left in the custody of Hale, denied in the first place, his authority to collect, and Slusher’s authority to pay the money. It charged, in the next place, that if such authority at any time existed, it was suspended by the war ; and if not suspended did *429 not justify Hale iu receiving in discharge of the debt, the paper currency of Virginia. It alleged ignorance of what had been done and prayed a discovery.
There was an amended bill filed, which, after repeating the allegations of the original bill, charged among other things, that the deposits made by Hale as aforesaid, being made in his own name, amounted to a conversion and appropriation of the funds to his own use, and that he thereby became responsible for the full amount deposited, with interest.
Hale and Slusher severally answered the original and amended bills, setting forth in substance the facts above detailed ; and both affirming directly and unequivocally, that full authority was given to Hale by Wall to make the collections. This authority was, in addition to the sworn statements of the answers, abundantly proved by the testimony iu the cause, and has been conceded at the bar.
Upon the hearing of the cause, the Circuit court dismissed the bill as to Slusher, but hold Hale responsible for the several amounts deposited by him as aforesaid, with interest from the dates of the deposits, and decreed accordingly.
From this decree both Hale and Wall have appealed to this court. Hale because he was held responsible for the deposits ; Wall because the bill was dismissed as to Slusher.
We will consider first the decree against Hale. Was it proper to hold him responsible for the.sums of money deposited in the banks at Chistiansburgand Blacksburg ? It has not been contended before this court, and could not be successfully contended, that Hale was not the ageut of Wall, duly authorized by him to collect the funds in question. That is conceded.
But it is insisted in support of the decree ;
1. That the agency of Hale w’as not confined to the collection and preservation of the fund, hut that it ex *430 tended also to its transmission to Wall in Missouri; and as the war between the United and Confederate States put a stop to all communication between the citizens of the States of Virginia and Missouri, and rendered it unlawful, the right to transmit the funds became unlawful, and was suspended, and with it the right to collect was also suspended.
2. Conceding his authority to collect, Hale had no authority to receive in discharge of the debt the depreciated paper currency of Virginia.
3. By depositing the funds in bank in his own name, and leaving them there without further attention, Hale had converted and appropriated them to his own use, and thereby became debtor to Wall for the entire amount.
We will consider these propositions in their order.
1. Was the agency to collect the fund suspended by the war ?
That an alien enemy may keep an agent in the enemy’s country during the existence of war, with full power to collect money and preserve property, is a proposition too well established to require citation of authority. The question has very recently undergone a careful examination by this court, and the proposition was affirmed by all the judges, that whilst the authority of an agent to transmit money to his principal would be suspended by war, because such transmission would involve direct intercourse with the enemy, which is unlawful; the authority to collect and preserve remains unimpaired; and the debtor cannot, in such case, lawfully refuse to pay to the agent, nor the agent refuse to receive payment. Manhattan Life Insurance Company v. Warwick, 20 Gratt. 614, p. 635 to 638, and cases there cited by Judge Anderson, delivering the opinion of the court. Two of the judges, it is true, dissented on the merits—Judges Christian and Moncure—but both of them concurred with the majority, in affirming the principle above stated. Judge Christian, with whom Judge Moncure concurred, speak *431 ing at page 653 of the cases on this subject, says: “These cases decide that it is lawful for an alien enemy to keep an agent in the enemy’s country to receive money or to take care of his property during war.”
The case furnishes a complete answer to the argument of the learned counsel for the appellee on this question. That ai’gument was, that it was the duty of Hale in this case not merely to collect the fund, but also to transmit it to Wall in Missouri; that the right to transmit was clearly suspended by the war ; and as the authority to collect was conferred for the purpose—and only for the purpose—of transmitting the fund, when the latter right fell the former necessarily fell with it. The view is plausible, but is completely answered by the case of the Manhattan Life Insurance Company v. Warwick. In that case it was the duty of the Virginia agent of the New York company to collect the premiums due the company in Virginia; but it was essentially his duty also to transmit those premiums to his principal in New York. This court held, that whilst the war necessarily suspended the right to transmit the premiums to New York, the right of the agent to collect them was not only not suspended, hut that it was his imperative duty to receive those premiums if tendered at the proper time.
The Supreme court of the United States in the case of Ward v. Smith, 7 Wall. U. S. R. 447 (cited by appellee’s counsel for another purpose), affirm the same principle. Speaking of alike case, they say, p. 452: “When an agent appointed to receive money resides in the same jurisdiction with the debtor, the latter cannot justify• his refusal to pay the demand, and of course the interest which it bears. It does not follow that the agent, if he receive the money, will violate the law by remitting it to his alien principal.”
But it is wholly unnecessary to multiply authorities on the question. We are of opinion that the right and duty of Hale to collect of Slusher the debt in question, *432 and the right and duty of Slusher to pay, were not impaired by the war.
2. Had Hale, as agent, the right to receive the paper-currency of Virginia in discharge of the debt ?
It will be remembered that- when the debt was contracted, both debtor and creditor were citizens and residents of Virginia; that the contract was made in Virginia ; that when the creditor left the State he appointed, as his agent to collect the debt, a citizen and resident of Virginia, with whom he left the bonds, and that both agent and debtor continued to reside in Virginia. As a matter-of course, all parties expected the debt to be paid in' Virginia currency, unless that currency should become so depreciated as to render its reception an act of obvious impropriety. Such certainly was not the case when-the payments in question were made. The currency received by Hale was the very same which we know, as matter of history, was everywhere received and paid' out at that time by business men of the State, and” which they were always glad to receive. It was, in fact, but little depreciated at that time—not more than the-paper currency of the United States, if so much. It' was, in fact, substantially the same kind of money which "Wall himself had been glad to receive of Slusher in October 1860. Slushei’’s payment was made by a deposit in the branch bauk at Blacksburg, and was, therefore, in effect, a payment in bank paper, and in paper of the same bankgn which Hale made his special deposit of $1,307.24. Collecting them asílale did—a Virginia debt from a Virginia debtor—in funds everywhere in the State received and paid out as money; ■ charging not even the smallest commission for his services and his risk; making no use whatever of the fund, but depositing it at once in bank, to remain, as he supposed, secure and intact for his friend, and utterly ignorant, as he appears to have been, that there was other security for the debt than the single obligation of ' *433 the debtor; it would be, unkind and unreasonable, to the last degree, to impute bad faith or breach of trust to this illiterate and feeble-minded old man: and without such imputation, having full power to collect as he did, his act cannot be impeached. Myers, &c., v. Zetelle, 21 Gratt. 733, and cases cited by Judge Christian.
But this court has recently decided the precise question in the case of Pidgeon v. Williams, 23 Gratt. 251. That was a case in which the professional firm of Barton & Williams,- lawyers, of Winchester, Virginia, had been employed in 1860, or early in 1861, to collect an old debt for a client who was sometimes in Virginia and sometimes in Maryland. On the 21,si of February 1862, just about the date of Hale’s first collection, they collected for their client, in Confederate States treasury notes, $1,028.50 ; and on the same day they deposited in bank to the credit, of their own “collection account,” not the full amount collected, as Hale did, but the sum of $932.95, being net amount after deducting fee and commissions. They had not seen their client for a long time, did not write to him, and the sum remained in bank uncalled for until the close of the war, and was lost like that in controversy in this case—not by the negligence or misconduct of the agents, but by the disastrous results of the war. Williams, the surviving partner, .was sued for the amount of the deposit in January 1866, as Hale was, and a verdiet and judgment was rendered for the defendant. This judgment was-approved and affirmed on appeal to this court. The court say, ,p. 254: “And first as to receiving Confederate money. The proof is, that at the time the money was received, Confederate treasury notes were worth only ten per cent, less than gold, including exchange; that it was almost the only currency of the-country, as good as any, and better than greenbacks, and that it was received and paid out by the banks, and. *434 was the currency generally, if not universally, used in all the transactions of life; that gold had ceased to be a currency, and was sold as a commodity, and that the attorneys could not have collected the debt at all, if they had refused to receive Confederate currency. The claim had been placed in their hands for collection, and it was their duty to collect it. They had not been instructed by their client not to receive payment in Confederate currency; and we are of opinion that it would be unreasonable to hold them responsible, under the circumstances, for having done so.” Every word in this extract applies “a fortiori” to the case before us. If it would be unreasonable to fasten a loss, under such circumstances, upon learned counsel of large experience and much ability, rendering a service for compensation, much more unreasonable would it be to fasten a loss, under precisely the same circumstances, on an illiterate and feeble-minded old man, who supposed he was doing an act of kindness to a neighbor, and acted without expectation or desire of reward. ¥e are of opinion that Hale should not be held responsible for receiving bank notes and Confederate States treasury notes in discharge of the debt.
3. Nor do we think that the deposit in bank in his own name should render him responsible. Banks have always been regarded by the courts in Virginia as the safest places of deposit for money. The funds of married women, infants, lunatics and suitors of every character, are there deposited under orders of court; and in the case just cited of Pidgeon v. Williams, the court held that it was a proper and the best place, even during the war and on the border; and that the deposit was good, although not in the name of the client. Had the deposits been made in the name of Wall, or in the name of Hale for Wall, there could not be a question about them. But it is said, and truly said, that they were not so *435 made,p>ut in the name of Sale. They do not appear, however, to have been mixed with any money of his own; nor does it appear that he kept a bank account at all. But it does appear that he did what is rarely done, except when a person is depositing money for another— he took formal certificates for both deposits, and kept them]until the war was over, and then tendered them to Wall. The court is well satisfied that he did not use the money in any manner or for any purpose, and it was not lost by reason of being deposited in bank in his own name. Precisely the same result would have followed had the deposit been made in the name of Wall himself. It was the result of an overwhelming disaster, which ^involved not only individuals, but communities and States, in a common ruin. In the expressive language of Judge Christian, in Davis’ commissioner v. Harman, &c., 21 Gratt., 194, p. 203: “It was not the failing of a bank, or the insolvency of a banker, but it was the sudden and irretrievable destruction of the whole currency of a country by the termination of a civil war, which had destroyed the very power that created it.” And we approve and adopt the concluding paragraph of the opinion in that case as strikingly apposite to the case before us:
“It would be too rigorous and unjust; it would be in violation of those well settled principles, founded in reason and conscience, which control the action of courts of equity, to hold that though the appellant has been guilty of no mala jides, no misconduct, no negligence, yet he is to be held responsible for a loss which he had no part in creating and no power to prevent. But that loss, we think, ought to fall upon those who were entitled to the fund that has perished.”
The court is of opinion that so much of the decree of the Circuit court as holds Hale responsible for the loss is erroneous, and should be reversed, and the bill dismissed.
*436 On the cross-appeal, the court is of opinion, for the same reasons, that there is no error in so much of the decree of the Circuit court as dismissed the bill as to Slusher, and that th¿ same be affirmed, with costs, &e., to the appellee.
The decree as to Hale, reversed; as to Slusher, AEEIRMED.