Burks, J.'
In a foreign or international w&r, from the time it is declared or recognized, all the people in the territory and subject to the dominion of each belligerent, without regard to their feelings, dispositions or natural relations, become, in legal contemplation, and so continue to the close of hostilities, the enemies of all the people resident in the territory of the other belligerent; and all negotiation, trading, intercourse or communication between them, unless licensed by the government, is unlawful. Such a war, as between the citizens or subjects of the respective belligerents, ipso facto dissolves all commercial partnerships and all contracts wholly executory and requiring for their continued existence commercial intercourse or communication; and while it does not abrogate, yet it suspends all other existing contracts and obligations and the remedies thereon, and renders all contracts, with rare *835 exceptions, entered into pending hostilities, illegal and void.
These familiar principles of public law, regulating conduct in foreign wars, have been applied by the courts of this country, state and federal, to the late war between the United States and the Confederate States. Griswold v. Waddington, 16 John. R. 438; Prize Cases, 2 Black’s U. S. R. 635; Mrs. Alexander’s Cotton, 2 Wall. U. S. R. 404; The William Bagaley, 5 Wall. U S. R. 377; Hanger v. Abbott, 6 Wall. U. S. R. 532; Matthews v. McStea, 91 U. S. Rep. (1 Otto) 7; Billgerry v. Branch & Sons, 19 Gratt. 393; Walker v. Bcauchler, 27 Gratt. 511.
Limited agencies in the enemy’s country may lawfully continue, provided they can be and are exercised without intercourse or communication between the citizens or subjects of the contending powers—such as agencies to collect and preserve, but not to transmit money or property. Buchanan v. Curry, 19 John. R. 136; Ward v. Smith, 7 Wall. U. S. R. 447; Manhattan Life Ins. Co. v. Warwick, 20 Gratt. 614; Hale v. Wall, 22 Gratt. 424; Mutual Benefit Life Ins. Co. v. Atwood’s adm’x, 24 Gratt. 497; The N. York Life Ins. Co. v. Hendren, Id. 536.
Such agencies, however, to be lawful, must, it seems, be created before the war begins, for there is no power it is said to appoint any agent for any purpose after hostilities have actually commenced, and that to this effect are all the authorities. United States v. Grossmayer, 9 Wall. U. S. R. 72; United States v. Lapine, 17 Wall. U. S. R. 602.
Relying upon the principles recognized by these authorities, the counsel for the appellant contends that the decree complained of in this case is erroneous and should be reversed.
*836 The bill of the appellant was filed against the personal representative and heirs at law of Robert Lump-kin, to recover the amount of a bond alleged to have been given by Lumpkin in his lifetime to the appellant’s testator, Thomas B. Small. The defendants answered that the debt was paid. The chancellor was satisfied that the defense was made good by the proofs, and decreed accordingly; and in this, I think, he committed no error. Lumpkin was a citizen of Virginia, and died in 1866. Small, a citizen of. Maryland, died there in March 1861. He left a wife and two sons (minors), entitled under the .laws of Maryland to his estate. After the payment-of his debts, which were inconsiderable, and two pecuniary legacies given by his will, the estate was worth upwards of sixty thousand dollars. The widow and two other persons qualified in Baltimore as representatives of the estate with the will of the testator annexed. She also qualified there as guardian of the children. The administration of the estate, except the Lumpkin debt, seems to have been conducted exclusively-by her co-administrators. The Lumpkin bond was left .with her and committed to her sole management.
Some time during the year 1861, the exact date not distinctly appearing, C. W. Small (the elder of the two sons) came to Virginia and enlisted as a soldier in the Confederate army, and continued in that service until the end of the war. While in Virginia, and during the war, he undertook to collect, and did collect, of Lumpkin the amount of his bond. The greater part was collected while he was under age. He became of age on the 30th day of December 1863; and on the 6th day of January 1864 he collected the remnant of the debt, amounting to $1,875.26. The collections were all made in Confederate currency, taken at its *837 par value. When he made the last collection he executed his covenant to Lumpkin, reciting all the payments made to him, ratifying thé collections made while he was a minor, and directing his guardian to charge him with what he had collected as a part of his distributive share of his father’s estate, acknowledging the receipt thereof as if the same hadj' been paid to him by the representatives of the estate on account of his interest therein.
When these payments- were made, Lumpkin (the debtor) was residing in Virginia, and Mrs. Small, the guardian of her son and representative of her husband’s estate, was a resident of Maryland.
In the light of the authorities before cited, it may be conceded, for the purposes of this case, that under the harsh rules of war, the mother and son are to be considered as bearing to each other the unnatural relation of alien enemies; that the occasional correspondence between them, which is proved to have taken place during the conflict of arms then raging, was forbidden and unlawful; and that, pending hostilities, she could confer no valid power upon him, as her agent, to make the collections which he did make. With this concession, however, it by no means follows that the payments make by Lumpkin to O. W. Small were unlawful, and that the obligation of Lumpkin to Small’s estate was not discharged.
Lumpkin and O. W. Small were both Confederates, both within the territory and under the dominion of the same belligerent power. They, at least, were not alien enemies to each other, and it was therefore perfectly competent for them to deal and contract as between themselves. They did so deal and contract Let it be, that the communication, addressed by Mrs. Small to Lumpkin was no valid authority for him to *838 make payment to her son as her agent. At the time-this letter was addressed by Mrs. Small to Lumpkin, was written to O. W. Small by John E. Larus, half-brother, and the agent of Mrs. Small, advising O. W. Small to make collections of Lumpkin, if pos- # 1 7 * sible, in something else than depreciated currency,. and warning him over and over again, that if he collected in such currency, it was his “own lookout,” it must be on “his own account.” After these cautions, repeated in varied language* he concludes that part of his letter which relates to this subject, in these emphatic words: “I think I have written plain enough, and the whole matter is thus left entirely to yourself, to take just as much as you choose, even if it is the whole amount, remembering, of course, that it is on your own account, at its par or nominal value."
“ The whole matter being thus left entirely to himself,” O. W. Small undertook to act for himself and to deal “on his own account.” He did so act and so deal. After attaining full age, he had the right so to act and so to deal, independently of any authority from his-mother or her agent; and accordingly when he received the last payment from Lumpkin, in his own name and on his own behalf he ratified all previous payments, dealings and transactions, and personally undertook that what he had received should stand as a payment to him of so much on account of his distributive share of his father’s estate, in like manner as if it had been paid to him by his father’s personal representative.
- . The war being over he returned to Maryland, and there with his mother and brother, the only parties-interested in the estate in the absence of Lumpkin, and without his agency or influence, the whole matter of the Lumpkin debt was satisfactorily arranged and *839 adjusted amongst them. Mrs. Small caused her accounts, as guardian of her two children, to be regularly and formally stated, settled and recorded. The Lumpkin debt was embraced in the settlement, and each of the wards gave her a full acquittance under seal, which was also duly recorded. This settlement appears to have been complete and final. The parties were all severally sui juris, acted with their eyes open, the facts fresh in their recollection, and with a full knowledge of their rights.
This settlement is conclusive against the parties to it, and binding upon the appellant. His administration here is but ancillary to the principal administration in Maryland. There the whole estate has been long since fully administered. The legacies under the will, and the debts against the estate, have all been fully paid, and the residue of the estate turned over to Mrs. Small and her children, who alone were entitled to it. It is not pretended that there are any creditors or other domestic claimants against the estate here. If therefore the appellant were permitted to recover thé amount of the debt claimed of Lumpkin’s estate, it would be for distribution to Mrs. Small and her . two sons. It has already been distributed amongst them, as shown by their own recorded admissions. It ought not to be collected and distributed a second time.
It is worthy of notice, that the Smalls had their final settlement amongst themselves as long ago as July 1865. The bill in this case was not filed until more than five years afterwards, and four years after Lumpkin’s death.
I am for affirming the decree of. the Chancellor.
Decree aeeirmed.